Aldridge v. Metro. Life Ins. Co., 2019 NCBC 49.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>UNION COUNTY<br><br><br><br><br>JAMES ALDRIDGE,<br><br>               Plaintiff,<br><br>v.<br><br>METROPOLITAN LIFE<br>INSURANCE COMPANY; MSI<br>FINANCIAL SERVICES, INC. f/k/a<br>METLIFE SECURITIES, INC.; and<br>BENJAMIN LOWDER, JR.,<br><br>               Defendants. | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>18 CVS 1050 [MASTER FILE]<br>Related Cases:<br>18 CVS 1124 (Union); 18 CVS 12201<br>(Mecklenburg); 18 CS 4978 (Guilford); 18<br>CVS 19512 (Mecklenburg); 18 CVS 528<br>(Lincoln); 18 CVS 307 (Yadkin)<br><br><br><br>**ORDER AND OPINION<br>ON DEFENDANTS'<br>RULE 12(b)(1) MOTIONS** |

1.     **THIS MATTER** is before the Court on fourteen separate motions to dismiss for lack of standing pursuant to Rule 12(b)(1) of the North Carolina Rules of Civil Procedure ("Rule(s)") filed in the following unconsolidated actions: (i) *J. Aldridge v. Metropolitan Life Insurance Co., et al.*, (18 CVS 1050; Union County); (ii) *K. Aldridge v. Metropolitan Life Insurance Co., et al.*, (18 CVS 1124; Union County); (iii) *Goulet v. Metropolitan Life Insurance Co., et al.*, (18 CVS 12201; Mecklenburg County); (iv) *Kelly, et al. v. Metropolitan Life Insurance Co., et al.*, (18 CVS 4978; Guilford County); (v) *Olin v. Metropolitan Life Insurance Co., et al.*, (18 CVS 19512; Mecklenburg County); (vi) *Peterson v. Metropolitan Life Insurance Co., et al.*, (18 CVS

528; Lincoln County); and (vii) *Williams, et al. v. Metropolitan Life Insurance Co., et al.*, (18 CVS 307; Yadkin County) (the "Actions").[1]

2. Although the Actions are unconsolidated, on August 15, 2019 the Court entered orders in each of the Actions consolidating them for purposes of issuing this Order and Opinion and designating *J. Aldridge v. Metropolitan Life Insurance Co.*, (18 CVS 1050; Union County), as the "Master File." (*See, e.g.*, ECF No. 75 (18 CVS 1050).)

3. The motions can be divided into five (5) groups:

(a) Defendants Metropolitan Life Insurance Company's ("MetLife Insurance") and MSI Financial Services, Inc., f/k/a MetLife Securities, Inc.'s ("MSI") (collectively, the "MetLife Defendants" or "MetLife") Motions to Dismiss: (i) Plaintiff James Aldridge's ("J. Aldridge") First Amended Complaint (the "J. Aldridge Complaint"), (ECF No. 52 (18 CVS 1050)),[2] (ii) Plaintiff Katherine Aldridge's ("K. Aldridge") First Amended Complaint (the "K. Aldridge Complaint"), (ECF No. 51 (18 CVS 1124)), (iii) Plaintiff Adam Goulet's ("Goulet") First Amended Complaint (the "Goulet Complaint"), (ECF No. 37 (18 CVS 12201)), (iv) Plaintiffs John "Kris" Kelly ("Kelly"), Paul M. Leite

---

[1] Defendants' fourteen separate motions to dismiss also seek dismissal of all claims in the seven Complaints for failure to state a claim pursuant to Rules 12(b)(6) and 9(b). Because of the complexity of the legal issues raised by the motions and the differing legal standards and analyses required under Rule 12(b)(1), on the one hand, and Rules 12(b)(6) and 9(b), on the other, the Court will address the motions under the latter Rules in a separate order and opinion.

[2] For purposes of this second paragraph, citations to docket entries on the Court's online docket are to the Motions to Dismiss in the Actions and not to the Complaints.

("Leite"), Randy J. Reittinger ("Reittinger"), Dana Lemons ("D. Lemons"), and Herbert Lee Lemons's (collectively with D. Lemons, the "Lemonses") First Amended Complaint (the "Kelly Complaint"), (ECF No. 60 (18 CVS 4978)), (v) Plaintiff Donald B. Olin's ("Olin") Complaint (the "Olin Complaint"), (ECF No. 19 (18 CVS 19512)), (vi) Plaintiff Andrew Peterson's ("Peterson") First Amended Complaint (the "Peterson Complaint") (ECF No. 46 (18 CVS 528)), and (vii) Plaintiffs James Williams ("J. Williams") and William Van Williams's (collectively with J. Williams, the "Williamses") First Amended Complaint (the "Williams Complaint"), (ECF No. 48 (18 CVS 307)), (all twelve plaintiffs collectively, "Plaintiffs") (all seven complaints collectively, the "Complaints") (all seven of the MetLife Defendants' motions to dismiss the Complaints collectively, the "MetLife Motions");

(b)     Defendant Benjamin Lowder, Jr.'s ("Lowder") Motion to Dismiss the J. Aldridge Complaint, (ECF No. 50 (18 CVS 1050));

(c)     Lowder and Defendant Gary Wayne Hammond's ("Hammond") Motions to Dismiss: (i) the K. Aldridge Complaint, (ECF No. 52 (18 CVS 1124)), and (ii) the Olin Complaint, (ECF No. 17 (18 CVS 19512));

(d)     Hammond's Motions to Dismiss: (i) the Goulet Complaint, (ECF No. 39 (18 CVS 12201)), and (ii) the Peterson Complaint, (ECF No. 44 (18 CVS 528)); and

(e)     Defendant John D. Phillips's ("Phillips") Motions to Dismiss: (i) the Kelly Complaint, (ECF No. 58 (18 CVS 4978)), and (ii) the Williams Complaint, (ECF No. 46 (18 CVS 307)), (Lowder, Hammond, and Phillips collectively, the "Individual Defendants") (the Individual Defendants' motions to dismiss collectively, the "Individual Defendants' Motions").

The Individual Defendants and the MetLife Defendants are collectively referred to herein as "Defendants."   The MetLife Motions and the Individual Defendants' Motions are collectively referred to herein as the "Motions."

4.     Having considered the Motions, the parties' briefs in support of and in opposition to the Motions, the arguments of counsel at the March 6, 2019 hearing on the Motions, and other appropriate matters of record, the Court hereby **DENIES** the Individual Defendants' Motions and **GRANTS in part** and **DENIES in part** the MetLife Motions, for the reasons set forth below.

*Hemmings & Stevens, PLLC, by Aaron C. Hemmings and Kelly Ann Stevens, for Plaintiffs.*

*Parker Poe Adams & Berstein LLP, by Charles E. Raynal IV, William Esser, Stephen Vincent Cary, and Katie M. Iams; and Morgan Lewis & Bockius, LLP, by Amy J. Greer and John Alfred Vassallo, for the MetLife Defendants.*

*Cranfill Sumner & Hartzog LLP, by Marshal F. Wall and Mica Nguyen Worthy, for Defendants Lowder and Hammond.*

*Wyatt & Blake, by James Frank Wyatt III; and Mullins Duncan Harrell & Russell PLLC, by Leslie Cooper Harrell, for Defendant Phillips.*

Robinson, Judge.

## I.  INTRODUCTION

5.      These lawsuits arise out of an alleged Ponzi scheme[3] operated by Charlotte, North Carolina businessman Richard C. Siskey[4] ("Siskey") for a number of years prior to his death on December 28, 2016.  Each plaintiff engaged Siskey as a securities broker, investment advisor, and/or insurance agent.

6.      From 2000 until his death in December 2016, Siskey is alleged to have been a MetLife employee, working as a financial and investment advisor, securities broker, and insurance salesman at Wall Street Capitol, MetLife's Charlotte, North Carolina branch office through which MetLife and its agents sold securities and insurance policies and provided financial and investment advice.  The Individual Defendants are all MetLife employees who worked with Siskey at the Wall Street Capitol office.  Plaintiffs bring these Actions alleging that Defendants knew of, participated in, and/or assisted Siskey in concealing his Ponzi scheme and allowed Siskey to continually defraud Plaintiffs and others[5] over his sixteen years working for MetLife at the Wall Street Capitol office.

---

[3] As explained by this Court in a related case, "[a] Ponzi scheme is a scam whereby early investors are paid returns from money contributed by later investors in order to entice more investors." *Stone St. Partners, LLC v. Williamson*, 2018 NCBC LEXIS 77, \*2 n.1 (N.C. Super. Ct. July 26, 2018) (quoting *Blyth v. McCrary*, 184 N.C. App. 654, 657 n.1, 646 S.E.2d 813, 815 n.1 (2007)); *see also United States v. Loayza*, 107 F.3d 257, 259 n.1 (4th Cir. 1997) (defining "Ponzi scheme" as a form of fraud "in which early investors are paid off with money received from later investors to prevent discovery and to encourage additional and larger investments").

[4] Neither Siskey nor his estate is a party to any of the Actions.

[5] As of the date of this Order and Opinion, the undersigned presides over six additional lawsuits involving Siskey's alleged Ponzi scheme pending in the Business Court.  *See, e.g.*,

7.      Of relevance to the Motions, Plaintiffs allege that through Defendants' actions they invested in one or more of the following four entities now in bankruptcy proceedings before the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court" or "Bankruptcy Proceedings"): TSI Holdings, LLC ("TSI Holdings"), WSC Holdings, LLC ("WSC Holdings"), SouthPark Partners, LLC ("SPP"), and Sharon Road Properties, LLC ("SRP") (collectively, the "Bankrupt Entities").[6]  The issue before the Court on the Motions is whether Plaintiffs, rather than the trustee in the Bankruptcy Proceedings, Joseph W. Grier (the "Bankruptcy Trustee"), has standing to assert the claims brought in the Complaints to the extent such claims are based on Plaintiffs' investments in the Bankrupt Entities.

## II.      PROCEDURAL BACKGROUND

8.      The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

9.      Plaintiffs initiated the Actions in 2018,[7] and the Actions were thereafter designated as mandatory complex business cases under N.C.G.S. § 7A-45.4(a) by

---

*Brewer v. Metro. Life Ins. Co.*, 2018 CVS 21685 (Mecklenburg County, N.C. Super. Ct.); *Dreibelbis v. Metro. Life Ins. Co.*, 2019 CVS 5033 (Mecklenburg County, N.C. Super. Ct.); *Machen v. Metro. Life Ins. Co.*, 2018 CVS 24234 (Mecklenburg County, N.C. Super. Ct.); *Martin v. Metro. Life Ins. Co.*, 2018 CVS 22954 (Mecklenburg County, N.C. Super. Ct.); *Packer v. Metro. Life Ins. Co.*, 2019 CVS 12902 (Mecklenburg County, N.C. Super. Ct.); *Spillars v. Metro. Life Ins. Co.*, 2018 CVS 23038 (Mecklenburg County, N.C. Super. Ct.).

[6] *In re TSI Holdings, LLC*, Petition No. 17-30132 (Bankr. W.D.N.C.); *In re WSC Holdings, LLC*, Petition No. 17-30338 (Bankr. W.D.N.C.); *In re SouthPark Partners, LLC*, Petition No. 17-30339 (Bankr. W.D.N.C.); *In re Sharon Road Properties, LLC*, Petition No. 17-30363 (Bankr. W.D.N.C.).

[7] The original complaints in the first six Actions were filed on the following dates: (i) J. Aldridge Complaint – April 26, 2018, (ECF No. 3 (18 CVS 1050)); (ii) Peterson Complaint –

order of then-Chief Justice Mark R. Martin, (*see, e.g.*, ECF No. 6 (18 CVS 1050)), and assigned to the Honorable Louis A. Bledsoe, III, (*see, e.g.*, ECF No. 2 (18 CVS 1050)). Thereafter, the Actions were re-assigned to the undersigned on February 15, 2019. (*See, e.g.*, ECF No. 66 (18 CVS 1050).)

10. The J. Aldridge Complaint, K. Aldridge Complaint, Goulet Complaint, Kelly Complaint, Peterson Complaint, and Williams Complaint each allege nine claims for relief: fraud; constructive fraud; violations of the North Carolina Securities Act ("NCSA"); negligent misrepresentation; professional negligence[8]; negligence[9]; unfair and deceptive trade practices ("UDTP")[10]; vicarious liability[11]; and punitive damages. The Olin Complaint contains these same claims for relief along with claims for

---

April 27, 2018, (ECF No. 3 (18 CVS 528)); (iii) Kelly Complaint – May 3, 2018, (ECF No. 4 (18 CVS 4978)); (iv) K. Aldridge Complaint – May 7, 2018, (ECF No. 3 (18 CVS 1124)); (v) Williams Complaint – May 22, 2018, (ECF No. 3 (18 CVS 307)); and (vi) Goulet Complaint – June 18, 2018, (ECF No. 3 (18 CVS 12201).) Each of these original complaints was amended as of right on September 26, 2018. (ECF No. 37 (18 CVS 1050); ECF No. 31 (18 CVS 528); ECF No. 48 (18 CVS 4978); ECF No. 36 (18 CVS 1124); ECF No. 36 (18 CVS 307); ECF No. 24 (18 CVS 12201).) The Olin Complaint was filed on October 9, 2018, (ECF No. 3 (18 CVS 19512)), and has not been amended.

[8] Plaintiffs assert their claims for professional negligence only against the Individual Defendants.

[9] Plaintiffs assert their claims for negligence only against the MetLife Defendants.

[10] Plaintiffs' UDTP claims were originally asserted against the MetLife Defendants and former-Defendant 4th Floor Properties, LLC ("4th Floor Properties"). Except for Olin, who asserted no claims against 4th Floor Properties, Plaintiffs voluntarily dismissed their claims against 4th Floor Properties without prejudice on October 31, 2018. (ECF No. 44 (18 CVS 1050); ECF No. 38 (18 CVS 528); ECF No. 43 (18 CVS 1124); ECF No. 42 (18 CVS 307); ECF No. 31 (18 CVS 12201); ECF No. 54 (18 CVS 4978).) Accordingly, Plaintiffs now assert their UDTP claims only against the MetLife Defendants.

[11] Plaintiffs assert their claims for vicarious liability only against the MetLife Defendants.

violations of the North Carolina Investment Advisors Act ("NCIAA") against (i) the MetLife Defendants, and (ii) Lowder and Hammond.

11. Defendants filed the Motions on December 3, 2018 with respect to all Complaints other than the Olin Complaint. Lowder and Hammond filed their motions as to the Olin Complaint on December 19, 2018, and the MetLife Defendants filed their motions on with respect to the Olin Complaint on December 20, 2018. The Motions have been fully briefed, and the Court held a hearing on the Motions on March 6, 2019 at which all parties were represented by counsel.

12. The Motions are ripe for resolution.

### III.    FACTUAL BACKGROUND[12]

13. The Court does not make findings of fact when ruling on motions to dismiss under Rule 12(b)(1) but only recites those factual allegations that are relevant and necessary to the Court's determination of the Motions.

---

[12] The Complaints, all prepared and drafted by the same attorneys at the same law firm, contain nearly verbatim allegations concerning the Ponzi scheme and Defendants' alleged involvement therein before alleging, under a separate heading in each complaint, the allegations purportedly relevant to the particular plaintiff(s)' claims. Therefore, to assist in readability and to avoid large record citations, with few exceptions, the Court cites to the numbered allegations in one complaint only—the J. Aldridge Complaint—for much of this section. Because neither Hammond nor Phillips are named defendants in the J. Aldridge Complaint, certain facts pertaining to those two defendants, and common to the actions in which they are named defendants, are drawn from the K. Aldridge Complaint (for Hammond) and the Kelly Complaint (for Phillips). The Court has carefully reviewed all the Actions to ensure that the allegations relevant to its analysis and rulings are consistent across each complaint, and where they are not, the Court has so noted. For reference, these general allegations appear in the J. Aldridge Complaint at paragraphs 9−111; the K. Aldridge Complaint at paragraphs 10−112; the Goulet Complaint at paragraphs 9−111; the Kelly Complaint at paragraphs 14−116; the Olin Complaint at paragraphs 10−111; the Peterson Complaint at paragraphs 9−111; and the Williams Complaint at paragraphs 11−113. When presenting Plaintiffs' specific allegations leading up to and surrounding their investments in the Ponzi scheme—and particularly in the Bankrupt Entities—the Court cites to the Plaintiff-specific allegations in the appropriate Complaint.

## A.    The Parties

14.    Plaintiffs are all residents of North Carolina.  J. Aldridge and K. Aldridge reside in Union County.  (J. Aldridge Compl. ¶ 2, ECF No. 37; K. Aldridge Compl. ¶ 2, ECF No. 36.)  Goulet and Olin reside in Mecklenburg County.  (Goulet Compl. ¶ 2, ECF No. 24; Olin Compl. ¶ 2, ECF No. 3.)  Kelly, Leite, Reittinger, and the Lemonses, reside in Guilford County.  (Kelly Compl. ¶¶ 2–6, ECF No. 48.)  Peterson resides in Lincoln County. (Peterson Compl. ¶ 2, ECF No. 31.)  The Williamses reside in Yadkin County.  (Williams Compl. ¶¶ 2–3, ECF No. 36.)

15.    MetLife Insurance is a New York corporation with its principal place of business located in New York, New York. (J. Aldridge Compl. ¶ 3.)  MSI is a Delaware corporation with its principal place of business located in Springfield, Massachusetts. (J. Aldridge Compl. ¶ 4.)  During the time period relevant to the Complaint, MSI was a wholly owned subsidiary of MetLife Insurance.  (J. Aldridge Compl. ¶ 4.)  MSI is registered with the Securities and Exchange Commission (the "SEC") as a broker-dealer under Section 15(b)(1) of the Securities Exchange Act of 1934 and is a registered investment advisor under N.C. Gen. Stat. § 78C-2.  (J. Aldridge Compl. ¶ 4.)  The MetLife Defendants have offices located in Mecklenburg County, North Carolina, conducting business in North Carolina under the registered assumed name "Wall Street Capitol."  (J. Aldridge Compl. ¶¶ 3–4, 9, 15.)

16.    The Individual Defendants are all residents of North Carolina.  (J. Aldridge Compl. ¶ 6; K. Aldridge Compl. ¶ 7; Kelly Compl. ¶ 10.)  Lowder and Phillips reside

in Mecklenburg County. (J. Aldridge Compl. ¶ 6; Kelly Compl. ¶ 10.) Hammond resides in Lincoln County. (K. Aldridge Compl. ¶ 7.)

17.     From 2000 through at least 2016, the Individual Defendants were MetLife employees, working alongside Siskey at MetLife's Wall Street Capitol office as licensed insurance agents, securities brokers, and financial and investment advisors. (J. Aldridge Compl. ¶¶ 24, 26; K. Aldridge Compl. ¶¶ 32, 34; Kelly Compl. ¶¶ 32, 34.) As part of their employment with MetLife, the Individual Defendants sold life, accident, and sickness insurance products, provided financial advice, and/or sold securities to Plaintiffs and other MetLife customers. (J. Aldridge Compl. ¶ 25; K. Aldridge Compl. ¶ 33; Kelly Compl. ¶ 33.) Additionally, in 2001, Phillips and Siskey formed WSC Holdings, for which Siskey and the Individual Defendants solicited MetLife customers' investments. (Kelly Compl. ¶ 35.) With MetLife's approval, Phillips and Siskey served as officers of WSC Holdings. (Kelly Compl. ¶ 35.)

### B.     Siskey and Wall Street Capitol

18.     In 1999, Siskey assisted MetLife in forming and establishing Wall Street Capitol as MetLife's branch office in Charlotte, North Carolina. (J. Aldridge Compl. ¶ 14.) In January 2000, MetLife filed a Certificate of Assumed Name with the Register of Deeds in Mecklenburg County, North Carolina to operate its business under the name "Wall Street Capitol." (J. Aldridge Compl. ¶ 15.) MetLife leased office space for the Wall Street Capitol branch on the fourth floor of a building located at 4521 Sharon Road, Charlotte, North Carolina. (J. Aldridge Compl. ¶ 21.)

19.     Under the name Wall Street Capitol, MetLife sold life insurance products to the public, and bought and sold various securities, stocks, bonds, mutual funds, and other investment products as a broker-dealer. (J. Aldridge Compl. ¶¶ 16–17.) MetLife placed signs at the entrance and around the Wall Street Capitol office indicating that Wall Street Capitol was "an office of MetLife." (J. Aldridge Compl. ¶¶ 22, 37(a)).) Siskey presented Wall Street Capitol to the public as "an office of MetLife[,]" (J. Aldridge Compl. ¶ 20), and stated in written advertisements and offers to sell securities that he was "the Founder of Wall Street Capitol, a broad based retail financial services company that is part of MetLife Financial Services[,]" (J. Aldridge Compl. ¶ 37(e)). MetLife made similar representations in advertisements. (*See* J. Aldridge ¶ 37(c).) MetLife also provided its customers with periodic written life insurance, securities, and investment and portfolio statements with "Wall Street Capitol" listed as MetLife's branch office and 4521 Sharon Road, Suite 400, Charlotte, North Carolina as MetLife's address. (J. Aldridge ¶¶ 37(d), (f).)

20.     Siskey worked as a MetLife employee out of the Wall Street Capitol office from 2000 through his death in 2016. (*See* J. Aldridge Compl. ¶¶ 14–15, 18.) Like the Individual Defendants, Siskey was an insurance salesperson, financial and investment advisor, securities salesperson, and broker for MetLife. (J. Aldridge Compl. ¶¶ 18, 36.)

### C.    Wall Street Capitol Ponzi Scheme[13]

21.    During his tenure at Wall Street Capitol, Siskey formed more than twenty different companies, including TSI Holdings, SPP, WSC Holdings, and SRP. (J. Aldridge Compl. ¶ 42.) MetLife was aware of Siskey's formation of, and appointments to officer positions in, these companies. (J. Aldridge Compl. ¶¶ 44–46.)

22.    From the Wall Street Capitol office, Siskey and other MetLife employees (including the Individual Defendants) sold MetLife securities, as well as other securities and investments in Siskey's aforementioned companies, and used Siskey's companies to establish and implement an elaborate Ponzi scheme within MetLife's Wall Street Capitol branch office (the "Ponzi Scheme"). (J. Aldridge Compl. ¶¶ 47−49.)

23.    In October 2015, the Federal Bureau of Investigation ("FBI") began investigating Siskey's business transactions, including his transactions involving casinos, as well as his personal and business accounts. (J. Aldridge Compl. ¶ 50.) Of Siskey's twenty or more companies, the FBI identified the corporate bank accounts of the Bankrupt Entities—WSC Holdings, SPP, TSI Holdings, and SRP—and Siskey Industries, LLC ("Siskey Industries") as being used in the Ponzi Scheme. (J. Aldridge Compl. ¶ 51.) Plaintiffs allege that filings with the North Carolina Secretary of State identify Siskey as the manager, president, and/or organizing member of each of the Bankrupt Entities and Siskey Industries. (J. Aldridge Compl. ¶ 52.) In addition to

---

[13] The Complaints also outline an alleged insurance scheme operated by Siskey with the aid of the Defendants. (*See, e.g.*, J. Aldridge Compl. ¶¶ 98–111.) The Court does not discuss the details of the alleged insurance scheme in this Order and Opinion as they are irrelevant to Defendants' standing arguments presented in the pending Motions.

the five companies identified by the FBI as involved in the Ponzi Scheme, Plaintiffs allege that other Siskey-related corporate entities involved in the Ponzi Scheme included The Premier Fund, LLC, Premier One, LLC and Premier II, LLC ("Premier II") (all eight corporate entities together, referred to as the "Ponzi Entities"). (J. Aldridge Compl. ¶ 55.)

24. Specifically, Plaintiffs allege that, under the guise and appearance of MetLife over at least a sixteen-year period, Siskey purported to invest investors' (including Plaintiffs') money in the Ponzi Entities, but instead shuffled investor money between the bank accounts of the Ponzi Entities and his personal bank accounts. (J. Aldridge Compl. ¶ 56.) The funds shuffled to other Ponzi Entities' accounts and Siskey's personal accounts were used to pay for his lavish personal lifestyle, to pay his gambling debts, and to pay investors when they sought the return of their money. (J. Aldridge Compl. ¶ 56.) Siskey and the Individual Defendants, allegedly with MetLife's knowledge and while working at the Wall Street Capitol office, enticed Plaintiffs and other clients to invest cash, funds from their individual retirement accounts ("IRAs"), employee benefit plans, life insurance policies, and inheritances with the Ponzi Entities by falsely promising them "guaranteed" and "safe asset-backed investments" with a "fixed rate" of return that could be liquidated whenever the client desired. (J. Aldridge Compl. ¶¶ 57−60, 67.) Responding to solicitations from MetLife's Wall Street Capitol office, more than 200 investors invested in the Ponzi Scheme from 2000 through 2016 with Siskey and with the help of the Individual Defendants. (*See* J. Aldridge Compl. ¶¶ 57−60.)

25.     After the FBI seized Siskey's assets and publicly revealed the allegations concerning the Ponzi Scheme, Siskey committed suicide on December 28, 2016.  (J. Aldridge Compl. ¶¶ 53–54.)

26.     Plaintiffs allege that the MetLife Defendants participated in and ratified the Ponzi Scheme by allowing Siskey to continue as a MetLife employee and sell securities to investors, including Plaintiffs, when the MetLife Defendants had knowledge and actual notice of Siskey's illegal conduct in securities transactions. (*See* J. Aldridge Compl. ¶¶ 69, 73.) Specifically, Plaintiffs allege that as early as 2002, MetLife's Vice President and Compliance Director and MetLife's Senior Compliance Consultant (together, "MetLife's Senior Directors") discussed with Siskey, over several dates by phone and in writing, Siskey's involvement with some of the Ponzi Entities.  (J. Aldridge Compl. ¶ 70.)   Thereafter in 2004, Siskey was fined and suspended by the National Association of Securities Dealers ("NASD") for selling high risk promissory notes issued by some of the Ponzi Entities without disclosing his participation in these outside securities transactions.  (J. Aldridge Compl. ¶¶ 74–75.) Siskey's two-year suspension prohibited him from associating with any NASD member, including MetLife, in any capacity from 2004 to 2006.  (J. Aldridge Compl. ¶¶ 76–77.)

27.     In March 2011, the United States Department of Labor ("DOL") determined that Siskey and Wall Street Capitol had violated the Employee Retirement Income Security Act of 1974 ("ERISA") by investing the assets of employee benefit plans into the same Ponzi Entities that MetLife's Senior Directors discussed with Siskey in 2002

and that were involved in the 2004 NASD investigation. (J. Aldridge Compl. ¶ 81.) As a result of Siskey's ERISA violation, in 2011, the DOL permanently banned Siskey from acting in a fiduciary capacity on behalf of any employee benefit plan covered by ERISA. (J. Aldridge Compl. ¶ 81.)

28. Plaintiffs allege that, despite its knowledge of Siskey's participation in fraudulent securities transactions as early as 2002, MetLife took no action to stop Siskey's fraud on the Plaintiffs and the public, including after the disciplinary actions taken by the NASD and DOL in 2004 and 2011, respectively. (J. Aldridge Compl. ¶¶ 69, 72, 74, 76, 82.) Rather, during Siskey's 2004–06 suspension, MetLife allowed Siskey to continue providing investment advice and financial services, including selling securities from the Wall Street Capitol office to Plaintiffs and other MetLife customers. (J. Aldridge Compl. ¶¶ 77–78.) Additionally, Plaintiffs allege that, in 2011 and again in 2013, MetLife "reinstated Siskey as a MetLife broker and entered into additional brokerage contracts with him." (J. Aldridge Compl. ¶ 84.) Plaintiffs allege that MetLife allowed Siskey to carry on his everyday business for MetLife, continued to provide Siskey with office space, staff, furnishings and equipment, and continued to pay him his same compensation because he was a top sales performer and generated significant profits for the MetLife Defendants. (J. Aldridge Compl. ¶¶ 79, 87.)

### D. Plaintiffs' Investments in the Bankrupt Entities

29. Plaintiffs allege that they are each customers of MetLife, having been introduced to Wall Street Capitol and Siskey, as well as Lowder, Hammond, and/or

Phillips, at various times between 2000 and 2016. (*See* J. Aldridge Compl. ¶¶ 112–13, 116; K. Aldridge Compl. ¶¶ 112–13, 117–18; Goulet Compl. ¶¶ 112–13, 116; Kelly Compl. ¶¶ 117–18, 145–46, 170–71, 196–98, 222–24; Olin Compl. ¶¶ 112, 118, 120–21; Peterson Compl. ¶¶ 112–13; Williams Compl. ¶¶ 114–15.) Plaintiffs further allege that, when meeting with Siskey and one or more of the Individual Defendants, Siskey and the Individual Defendants represented to Plaintiffs that Wall Street Capitol was an office of MetLife and that Siskey and the Individual Defendants were employees and agents of MetLife, or otherwise represented MetLife in the sale of securities, investments, and insurance. (J. Aldridge Compl. ¶¶ 113–15; K. Aldridge Compl. ¶¶ 114–15; Goulet Compl. ¶¶ 113–14; Kelly Compl. ¶¶ 118, 146, 172–73, 198–99, 224–25; Olin Compl. ¶¶ 114, 116; Peterson Compl. ¶ 114; Williams Compl. ¶¶ 115, 133.) J. Aldridge, K. Aldridge, Goulet, Olin, Peterson, and J. Williams allege they observed signs and/or other representations at the Wall Street Capitol office indicating that it was an office of MetLife. (J. Aldridge Compl. ¶ 114; K. Aldridge Compl. ¶ 115; Goulet Compl. ¶ 115; Olin Compl. ¶ 115; Peterson Compl. ¶ 115; Williams Compl. ¶ 116.)

30. Each of the Plaintiffs alleges that Siskey and/or one or more of the Individual Defendants "enticed" them to invest with Wall Street Capitol, including in the Bankrupt Entities, by representing and promising Plaintiffs a fixed rate of return from safe, no-risk, asset-backed investments that could be liquidated whenever Plaintiffs desired. (*See* J. Aldridge Compl. ¶¶ 57–58; K. Aldridge Compl. ¶¶ 58–59, 61; Goulet Compl. ¶¶ 57, 60; Kelly Compl. ¶¶ 62, 64; Olin Compl. ¶¶ 57, 59, 61;

Peterson Compl. ¶¶ 57, 60; Williams Compl. ¶¶ 59, 61; *see also* J. Aldridge Compl. ¶126; K. Aldridge Compl. ¶ 141; Goulet Compl. ¶ 118; Kelly Compl. ¶¶ 118–19, 146–47, 173, 199, 225; Olin Compl. ¶¶ 121–22; Williams Compl. ¶¶ 115, 133.) Furthermore, J. Aldridge and K. Aldridge allege that MetLife represented to them that Siskey, Lowder, and Hammond were "trusted, reputable, and experienced investment advisers, brokers[,] and insurance agents of MetLife." (J. Aldridge Compl. ¶ 119; K. Aldridge Compl. ¶ 121.)

31.     Based on these representations, and other misrepresentations and omissions set forth below, Plaintiffs allege that Siskey and the Individual Defendants, "under the guise and appearance of MetLife and Wall Street Capitol," induced Plaintiffs to invest in one or more of the Bankrupt Entities through MetLife's Wall Street Capitol office. (J. Aldridge Compl. ¶¶ 57–58; K. Aldridge Compl. ¶¶ 58–59, 61; Goulet Compl. ¶¶ 57, 60; Kelly Compl. ¶¶ 62, 64; Olin Compl. ¶¶ 58–59, 61; Peterson Compl. ¶¶ 57, 60; Williams Compl. ¶¶ 59, 61.)

### E.     The Bankruptcy Proceedings

32.     On January 27, 2017, an involuntary bankruptcy petition was filed against one of the Ponzi Entities, TSI Holdings, thereby initiating a Chapter 7 bankruptcy case before the Bankruptcy Court. (J. Aldridge Compl. ¶ 62.) Thereafter, WSC Holdings, SPP, and SRP also entered bankruptcy, with the Bankruptcy Trustee serving as trustee for each of the Bankrupt Entities. (J. Aldridge Compl. ¶ 63; *see* J. Aldridge Compl. Ex. 10.)

33. Plaintiffs each filed proofs of claim in the Bankruptcy Proceedings directed to the particular Bankrupt Entity in which they invested. (*See, e.g.*, Ex. 1 to Pls.' Mot. for Extension of Time, ECF No. 58.1 ["Proofs of Claim"] (18 CVS 1050).) Specifically: (i) Goulet, Kelly, and Olin filed proofs of claim regarding TSI Holdings, (Proofs of Claim Ex. A); J. Aldridge, K. Aldridge, Leite, the Lemonses, and Reittinger filed proofs of claim regarding WSC Holdings, (Proofs of Claim Ex. B); J. Aldridge filed a proof of claim regarding SPP, (Proofs of Claim Ex. C); and J. Aldridge, Kelly, Peterson, and the Williamses filed proofs of claim regarding SRP, (Proofs of Claim Ex. E).

34. In late 2018, the Bankruptcy Trustee and other parties to the Bankruptcy Proceedings, including the MetLife Defendants, negotiated and submitted for the Bankruptcy Court's approval a settlement and release agreement (the "Settlement Agreement"). (Ex. 3 to Pls.' Mot. for Extension of Time Ex. A, ECF No. 58.3 ["Settlement Agreement"] (18 CVS 1050).) The Settlement Agreement essentially provides, in relevant part, that the Bankruptcy Trustee, on behalf of the Bankrupt Entities, releases all claims against MetLife arising out of the Ponzi Scheme in exchange for MetLife's contribution to a bankruptcy settlement fund. (*See* Settlement Agreement §§ 3(b), 6(e).)

35. The Settlement Agreement's release provision provides:

> The Trustee, on behalf of the [Bankrupt Entities], hereby releases . . . MetLife and any of MetLife's respective past and present . . . employees, [and] agents [e.g., the Individual Defendants] . . . (collectively, the "MetLife Released Parties"), from any and all claims, . . . and causes of action . . ., whether at law or in equity, [and] whether owned or

controlled by the Trustee or that the Trustee has standing to pursue on behalf of [the Bankrupt Entities].

(Settlement Agreement § 6(e)(i).) The Settlement Agreement further provides that the Bankruptcy Trustee releases MetLife of:

> causes of action for actual fraud, constructive fraud, negligent misrepresentation, . . . negligence, unfair and deceptive trade practices, . . . private causes of action based on state or federal insurance or securities law violation, vicarious liability, *respondeat superior*, . . . and/or punitive damages arising out of or relating to or in connection with acts or omissions by any of the MetLife Released Parties that allegedly injured the Ponzi Debtors [e.g., Plaintiffs] and/or SRP and, therefore, allegedly injured generally creditors of one or more of the [Bankrupt Entities.]

(Settlement Agreement § 6(e)(i).) Notably, pursuant to the Settlement Agreement, the Bankruptcy Trustee releases MetLife from liability for the same types of causes of action brought by Plaintiffs in the Actions. This release is limited, however, in that the release:

> shall not limit or otherwise affect causes of action against the MetLife Released Parties (if any) owned by individual creditors based on alleged misconduct directed specifically toward only such creditor and causing an injury unique only to such creditor (i.e., an injury other than the generalized harm to [the Bankruptcy Entities'] creditors caused by a loss of invested funds as a result of the Ponzi [s]cheme).

(Settlement Agreement § 6(e)(i) (emphasis omitted).)

36. At the hearing on the Motions, counsel for all parties represented and confirmed to the Court that all conditions precedent to the Bankruptcy Court's approval of the Settlement Agreement had been satisfied and that the Bankruptcy Court approved the Settlement, which is now in effect.

## IV.   ANALYSIS

37.   Defendants move to dismiss Plaintiffs' claims regarding their investments in the Bankrupt Entities pursuant to Rule 12(b)(1), arguing that: (a) the Bankruptcy Trustee has "first crack" at these claims; (b) the Bankruptcy Trustee has negotiated a settlement of these claims on behalf of the Bankrupt Entities; and (c) the Settlement Agreement includes a release of the MetLife Defendants and the Individual Defendants, as employees and agents of the MetLife Defendants, from all claims brought by Plaintiffs arising from Plaintiffs' investments in the Bankrupt Entities. (*See, e.g.*, MetLife Defs.' Mem. Supp. Mot. to Dismiss First Am. Compl. 32–35, ECF No. 53 (18 CVS 1050) ["MetLife's Mem. Supp."]; Defs. Lowder & Hammond's Mem. L. Supp. Mot. to Dismiss First Am. Compl. 10–13, ECF No. 54 (18 CVS 1124) ["Hammond & Lowder's Mem. Supp."]; Def. Phillips's Br. Supp. Mot. to Dismiss 4–6, ECF No. 59 (18 CVS 4978) ["Phillips's Br. Supp."]; MetLife Defs.' Reply Mem. Supp. Mot. to Dismiss First Am. Compl. 5–7, ECF No. 69 (18 CVS 1050) ["MetLife's Reply"]; Reply by Defs. Lowder & Hammond to Pl. K. Aldridge's Resp. to Defs.' Mot. to Dismiss 1–3, ECF No. 70 (18 CVS 1124) ["Lowder & Hammond's Reply"]; Def. Phillips's Reply Supp. Mot. to Dismiss 2–5, ECF No. 75 (18 CVS 4978) ["Phillips's Reply"].)[14]

38.   As a result, Defendants contend that Plaintiffs lack standing to bring their claims to the extent such claims are based on their investments in the Bankrupt Entities.  The Court notes at the outset that dismissal of Plaintiffs' claims pursuant

---

[14] As the Court did when citing to the Complaints for the common allegations describing the alleged Ponzi Scheme, where Defendants' arguments in their briefs are similar or identical against each Plaintiff, the Court cites to a single brief as representative of Defendants' arguments in each of the Actions.

to the Motions would not resolve all claims as to any given Plaintiff, nor would it result in a dismissal of the entirety of any of the Complaints. Collectively, Plaintiffs allege that they invested in several entities through Siskey and Wall Street Capitol, only four of which are part of the Bankruptcy Proceedings. Thus, to the extent Plaintiffs' claims are based on their investments in entities other than the Bankrupt Entities or premised on allegations unrelated to Plaintiffs' securities investments, their claims are not targeted by the Motions.

A. **Preliminary Matters: (i) Plaintiffs' UDTP and Punitive Damages Claims and (ii) Defendants' Collateral Estoppel Arguments**

39. Before addressing the merits of Defendants' arguments, the Court addresses three preliminary matters. First, the Court notes that Plaintiffs' UDTP claims appear to be based solely on allegations regarding an alleged insurance scheme and not on specific investments made in any entities, let alone investments in the Bankrupt Entities. (*See* J. Aldridge Compl. ¶¶ 240–48; K. Aldridge Compl. ¶¶ 227–35; Goulet Compl. ¶¶ 195–203; Kelly Compl. ¶¶ 310–18; Olin Compl. ¶¶ 239–44; Peterson Compl. ¶¶ 195–203; Williams Compl. ¶¶ 211–19.) Therefore, the Court concludes that Plaintiffs' UDTP claims are not subject to the following "first crack" analysis and DENIES the Motions under Rule 12(b)(1) to the extent the Motions seek dismissal of Plaintiffs' UDTP claims on this basis.[15]

---

[15] The MetLife Defendants also challenge Goulet's, Kelly's, Leite's, Reittinger's, the Lemonses', Olin's, Peterson's, and the Williamses' UDTP claims pursuant to Rule 12(b)(1) on standing grounds unrelated to the "first crack" doctrine. (*See* MetLife Defs.' Mem. Supp. Mot. to Dismiss First Am. Compl. 25, ECF No. 38 (18 CVS 12201); MetLife Defs.' Mem. Supp. Mot. to Dismiss First Am. Compl. 32, ECF No. 61 (18 CVS 4978); MetLife Defs.' Mem. Supp. Mot. to Dismiss Compl. 27–28, ECF No. 20 (18 CVS 19512); MetLife Defs.' Mem. Supp. Mot. to

40.     Second, the Court does not address Plaintiffs' standing to request punitive damages in this Order and Opinion.  Plaintiffs allege in each of the Complaints a separate, independent cause of action for punitive damages.  (*See* J. Aldridge Compl. ¶¶ 225–59; K. Aldridge Compl. ¶¶ 242–46; Goulet Compl. ¶¶ 210–14; Kelly Compl. ¶¶ 325–29; Olin Compl. ¶¶ 251–55; Peterson Compl. ¶¶ 210–14; Williams Compl. ¶¶ 226–30.)  North Carolina courts have repeatedly held that "a claim for punitive damages is not a stand-alone claim." *Funderburk v. JPMorgan Chase Bank, N.A.*, 241 N.C. App. 415, 425 (2015).  The Court concludes that, while this may be a basis for dismissing stand-alone claims for punitive damages pursuant to Rule 12(b)(6), the existence or non-existence of an independent cause of action under North Carolina law does not present a question of Plaintiffs' standing or the Court's subject matter jurisdiction under Rule 12(b)(1).  The Court therefore will not address Plaintiffs' stand-alone claim for punitive damages in this Order and Opinion.

41.     Finally, Defendants argue that J. Aldridge, Kelly, Peterson, and the Williamses are collaterally estopped from alleging that SRP was one of the entities Siskey used to perpetuate the Ponzi Scheme because the Bankruptcy Court has already determined that SRP is not a Ponzi entity.  (*See* MetLife's Mem. Supp. 35; MetLife's Reply 7; Phillips's Reply 5–6; Def. Lowder's Reply to Pl. J. Aldridge's Resp. to Lowder's Mot. to Dismiss 3, ECF No. 68 (18 CVS 1050); Def. Hammond's Mem.

---

Dismiss First Am. Compl. 25, ECF No. 38 (18 CVS 528); MetLife Defs.' Mem. Supp. Mot. to Dismiss First Am. Compl. 27–28, ECF No. 49 (18 CVS 307).)  Because the MetLife Defendants' arguments do not concern whether the Bankruptcy Trustee, rather than Plaintiffs, has standing to bring the UDTP claims, the Court elects to discuss the merits of these alternative arguments under Rule 12(b)(1) in its forthcoming order and opinion on Defendants' motions to dismiss pursuant to Rules 12(b)(6) and 9(b).

Supp. Mot. to Dismiss Am. Compl. 28, ECF No. 45 (18 CVS 528); Def. Phillips's Br. Supp. Mot. to Dismiss 7, ECF No. 47 (18 CVS 307); Def. Phillips's Reply Supp. Mot. to Dismiss 5–6, ECF No. 63 (18 CVS 307).)

42. Regardless of the MetLife Defendant's position on the applicability of the foregoing standing analysis to investments in SRP, the Settlement Agreement makes clear that the Bankruptcy Trustee, on behalf of SRP, settled all claims against MetLife and the Individual Defendants based on investments in SRP. (*See* Settlement Agreement § 6(e)(i).) Because the Bankruptcy Trustee has settled claims on behalf of SRP against Defendants, the Court must determine whether Plaintiffs have standing to assert claims based on their investments in SRP regardless of whether that entity was involved in the Ponzi Scheme. The Court will revisit, if necessary, the merits of Defendants' collateral estoppel argument when considering the motions to dismiss pursuant to Rules 12(b)(6) and 9(b). With these preliminary matters addressed, the Court turns to the merits of Defendants' "first crack" arguments.

## B.     **The "First Crack" Doctrine**

43. "Rule 12(b)(1) permits a party to contest, by motion, the jurisdiction of the trial court over the subject matter in controversy." *Swan Beach Corolla, LLC v. County of Currituck*, 234 N.C. App. 617, 621, 760 S.E.2d 302, 307 (2014) (citation and quotation marks omitted). A court shall dismiss the action when it appears that the court lacks subject matter jurisdiction. N.C.G.S. § 1A-1, Rule 12(h)(3).

44. "In order for a court to have subject matter jurisdiction to hear a claim, the party bringing the claim must have standing." *Newton v. Barth*, 248 N.C. App. 331, 336, 788 S.E.2d 653, 659 (2016) (citation and quotation marks omitted); *Smith v. Forsyth Cty. Bd. of Adjustment*, 186 N.C. App. 651, 653, 652 S.E.2d 355, 357 (2007) ("Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction, and is a question of law . . . ." (internal citations, quotation marks, and brackets omitted)). "[T]he party seeking to bring [its] claim before the court must include allegations which demonstrate why [it] has standing in the particular case[.]" *Cherry v. Wiesner*, 245 N.C. App. 339, 346, 781 S.E.2d 871, 877 (2016); *see Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002).

45. On a motion to dismiss under Rule 12(b)(1), the Court "may consider and weigh matters outside the pleadings." *Dep't of Transp. v. Blue*, 147 N.C. App. 596, 603, 556 S.E.2d 609, 617 (2001). If the Court "confines its evaluation to the pleadings," however, it "must accept as true the plaintiff's allegations and construe them in the light most favorable to the plaintiff." *Id.*

46. The filing of a bankruptcy petition "creates an estate." 11 U.S.C. § 541(a). "An estate is a separate legal identity, created on (and by) the filing of a bankruptcy petition, and continuing until confirmation, conversion, or dismissal of the case." *In re Herberman*, 122 B.R. 273, 278 (Bankr. W.D. Tex. 1990). Property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The phrase 'all legal or equitable

interests of the debtor in property' has been construed broadly, and includes 'rights of action' such as claims based on state or federal law." *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.2d 575, 584 (5th Cir. 2008) (citations omitted).

47.     Only the trustee of the bankruptcy estate has standing to pursue claims that belong to the bankruptcy estate unless and until the trustee abandons those claims.[16] *See Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999).  Put another way, "the trustee should have *first crack* at challenging the . . . transaction" and bringing claims against third parties.  *Id.* (emphasis added). North Carolina courts have recognized this principle, holding that "North Carolina state trial courts lack subject matter jurisdiction to hear claims belonging to a bankruptcy estate." *Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 26, 560 S.E.2d 817, 822 (2002) (citing *Tart v. Prescott's Pharmacies, Inc.*, 118 N.C. App. 516, 521, 456 S.E.2d 121, 125 (1995)); *Associated Hardwoods, Inc. v. Lail*, 2018 NCBC LEXIS 81, *9–10 (N.C. Super. Ct. Aug. 6, 2018); *Indus. Fabricators, Inc. v. At-Net Servs. – Charlotte, Inc.*, 2018 NCBC LEXIS 47, at *16–17 (N.C. Super. Ct. May 9, 2018). Accordingly, if Plaintiffs' claims based on their investments in the Bankrupt Entities are the property of the Bankrupt Entities' estates, only the Bankruptcy Trustee has standing to assert these claims.

---

[16] "After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  "Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate."  *Id.* § 554(d).

48. In the context of these Actions and the related Bankruptcy Proceedings, the term "first crack" doctrine is something of a misnomer. The record in the Bankruptcy Proceedings reflects that the Bankruptcy Trustee did not bring any claims against Defendants but rather entered into the Settlement Agreement with the MetLife Defendants and their employees/agents, the Individual Defendants. The Settlement Agreement, subsequently approved by the Bankruptcy Court and finalized, settled any and all claims against the MetLife Defendants and the Individual Defendants arising from their actions concerning the Bankrupt Entities and the Ponzi Scheme. Accordingly, the question before the Court is not quite whether the Bankruptcy Trustee should have "first crack" at Plaintiffs' claims; rather, it is whether Plaintiffs' claims fall within the scope of those claims the Bankruptcy Trustee had the power to settle, and did settle, on behalf of the Bankrupt Entities (or alternatively chose not to pursue). *See, e.g.*, *In re Midstate Mills*, 2015 Bankr. LEXIS 3105, at *19 (Bankr. W.D.N.C. Sept. 15, 2015).

49. In determining whether a claim is the property of the bankruptcy estate pursuant to section 541(a)(1), and thus "under the full authority of the bankruptcy trustee," the Court must examine the complaint's allegations and "the nature of the claim under state law." *Keener*, 149 N.C. App. at 26, 560 S.E.2d at 822; *see also Alvarez v. Ward*, 2012 U.S. Dist. LEXIS 4557, at *12 (W.D.N.C. Jan. 13, 2012).

50. In undertaking this analysis, the Court accepts as true Plaintiffs' allegations in the Complaints and construes the allegations in the light most favorable to Plaintiffs, *see Blue*, 147 N.C. App. at 603, 556 S.E.2d at 609, but does not

evaluate or determine the sufficiency of the allegations to state a claim, *see In re Midstate Mills*, 2015 Bankr. LEXIS 3105, at *19 ("The court will not determine whether the [ ] Plaintiffs have stated claims for relief . . . but will only decide whether the causes of action, as pled, fall within the scope of the claims settled by the Trustee . . . or . . . are personal to the [ ] Plaintiffs."); *Newton*, 248 N.C. App. at 335, 339–40, 343–45, 788 S.E.2d at 659, 661, 663–64 (considering "the gravamen" of plaintiffs' claims to determine whether plaintiffs or the bankruptcy trustee had standing and reserving for separate consideration under Rule 12(b)(6) a claim-by-claim determination of the sufficiency of the claims as pleaded); *see also A&G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv. Secs., LLC)*, 739 F. App'x 679, 685 (2d Cir. 2018) ("[T]he appropriate inquiry is not whether the complaint would survive a motion to dismiss pursuant to [Federal] Rule 12(b)(6). However, the substance of the allegations is relevant insofar as it helps us to determine whether, despite the label [plaintiffs] attach to it, the claim asserted is actually a disguised fraudulent transfer claim that is derivative of the [t]rustee's fraudulent transfer claim."); *In re Seven Seas Petroleum*, 522 F.3d at 587–88 ("It is not our place to consider whether the [plaintiffs'] allegations are sufficient to state a cause of action under Texas law, or to speculate as to what set of facts might ultimately be proven in support of recovery. . . . Simply put, the fact that the [plaintiffs] ultimately may be unable to prevail on the claims does not render the claims property of the [bankruptcy] estate.").

51. In North Carolina, the general rule is that "when all creditors of an insolvent or bankrupt corporation share an injury based on a common act, only a

receiver or trustee has standing to assert the creditors' collective claim against directors on behalf of the corporation." *Angell v. Kelly*, 336 F. Supp. 2d 540, 544−45 (M.D.N.C. 2004) (applying North Carolina law); *see Keener*, 149 N.C. App. at 25, 560 S.E.2d at 820; *see also Underwood v. Stafford*, 270 N.C. 700, 703, 155 S.E.2d 211, 213 (1967).  This principle is based on the rationale that a creditor in this situation has only been injured indirectly by the mere fact that the creditor, like all other creditors, cannot get what it is due because of a direct injury to the bankrupt entity.  *See Alvarez*, 2012 U.S. Dist. LEXIS 4557 at *12.

52.     However, there are limits to a bankruptcy trustee's standing to bring claims on behalf of third parties.  Specifically, relying on the United States Supreme Court's decision in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972), our Court of Appeals has noted that, typically, "the trustee's authority to bring suit on behalf of the bankruptcy estate does not extend to state law claims by the estate's creditors against third parties[,]" *Newton*, 248 N.C. App. at 337, 788 S.E.2d at 659 (citing *Caplin*, 406 U.S. at 433−34); *see also Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 67 (2d Cir. 2013).  The Court of Appeals has held that a bankruptcy trustee's standing to bring a claim against third parties is thus limited where the claim is founded on injuries peculiar or personal to an individual creditor rather than on injuries suffered by the bankrupt entity or all creditors generally.  *See, e.g.*, *Keener*, 149 N.C. App. at 26, 560 SE.2d at 822.  When a claim is peculiar or personal to an individual creditor, it belongs to, and is properly

maintained by, that particular creditor. *See id*. Pursuant to North Carolina law, therefore,

> creditors of a bankruptcy estate may prosecute individual actions against a third party if they can show either (1) that the wrongdoer owed them a special duty, or (2) that the injury suffered by the creditors is personal to them and distinct from the injury sustained by the corporation itself.

*Newton*, 248 N.C. App. at 338, 788 S.E.2d at 659–60 (quoting *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 660, 488 S.E.2d 215, 220–21 (1997) (quotation marks and brackets omitted)).

53. The *Newton* court's reliance on *Barger v. McCoy Hillard & Parks* for this proposition is perhaps not surprising given that many of this State's reported decisions concerning a creditor-plaintiff's standing to assert claims to the exclusion of the trustee largely concern creditors attempting to bring direct suits against directors and officers of bankrupt entities. *See generally Alvarez*, 2012 U.S. Dist. LEXIS 4557; *Angell*, 336 F. Supp. 2d 540; *In re Midstate Mills*, 2015 Bankr. LEXIS 3105; *Underwood*, 270 N.C. 700, 155 S.E.2d 211; *Keener*, 149 N.C. App. 19, 560 S.E.2d 817; *Associated Hardwoods*, 2018 NCBC LEXIS 81. These cases therefore discussed at length the presumption *against* individual creditors bringing actions individually for harm done to the bankrupt corporation. The Court notes that, here, Plaintiffs have not asserted claims against Siskey's estate arising from Siskey's role as a director of any of the Bankrupt Entities. Furthermore, Phillips is the only defendant alleged to be an officer of one of the Bankruptcy Entities—namely, WSC Holdings. (*See* Kelly Compl. ¶ 35.) Leite, the Lemonses, and Reittinger are the only Plaintiffs

who assert claims against Phillips based, at least in part, on their investments in WSC Holdings. (*See* Kelly Compl. ¶¶ 148, 174, 200, 226.) However, Leite, the Lemonses, and Reittinger do not base their claims against Phillips regarding investments in WSC Holdings on Phillips's officer status; rather, their claims are premised on Phillips's role in inducing them to invest in WSC Holdings as their investment advisor and as an employee of MetLife.

54. With the foregoing principles in mind, the Court turns to Defendants' specific "first crack" arguments.

### C. The Fact that Plaintiffs' Allegations Outline a Ponzi Scheme is Not Dispositive of Plaintiffs' Standing

55. Before considering Plaintiffs' claims, the Court may dispose of one broadly applicable argument advanced by the MetLife Defendants, Lowder, and Hammond. The argument is this: Plaintiffs lack standing to assert any claims regarding their investments in the Bankrupt Entities because, as evident by the nearly identical allegations across all Complaints, Plaintiffs suffered the same general injury experienced by any other investor in the Ponzi Scheme—diminution in value of their investments due to Siskey's transfer of invested funds from the Bankrupt Entities to other entities and/or his personal accounts. (*See* MetLife Mem. Supp. 34 & n.13; MetLife's Reply 5; Lowder & Hammond's Reply 3.) Indeed, the MetLife Defendants contend that each of the Plaintiffs' injuries, as alleged, were caused by the Ponzi Scheme and thus represent generalized, rather than particularized, harm. (*See* MetLife's Reply 5.)

56. This argument has surface appeal. As alleged, Siskey, allegedly with the aid of Defendants, orchestrated the Ponzi Scheme by soliciting Plaintiffs' and others' investments in companies that Siskey controlled; then, rather than investing Plaintiffs' funds, Siskey withdrew funds from the companies to fund his lavish personal lifestyle, pay his gambling debts, and pay other investors who sought the return of their invested funds. As a result of Siskey's withdrawal of funds, the companies were unable to repay investors, including Plaintiffs. The Bankruptcy Proceedings then ensued.

57. The MetLife Defendants contend that, as alleged, Plaintiffs' injuries were caused by Siskey's fraudulent transfer of funds from the Bankrupt Entities. (*See, e.g.*, MetLife's Reply 5.) According to the MetLife Defendants, Siskey's transfers of funds caused direct injuries to the Bankrupt Entities, and Plaintiffs' losses as investors in the Bankrupt Entities were "merely indirect or derivative of the companies' loss[es]." (MetLife's Reply 5.) Because Plaintiffs' losses are exactly the same as the losses of the Bankrupt Entities (and of all other investors in the Ponzi Scheme), the MetLife Defendants argue that Plaintiffs' claims, however denominated, are simply fraudulent transfer claims that belong to the Bankrupt Entities, and thus only the Bankruptcy Trustee has standing to bring these claims. (MetLife's Reply 5–6; *see* MetLife's Mem. Supp. 34–35.)

58. The MetLife Defendants cite to several cases in which courts have held that victims of Ponzi schemes lack standing to assert claims against third parties to recover for lost investments in a Ponzi-scheme entity in bankruptcy. (MetLife Mem.

Supp. 34 & n.13.) Lowder and Hammond go so far as to say that a conclusion that Plaintiffs, as Ponzi scheme victims, have standing to bring their claims is "inconsistent with the law[.]" (Lowder & Hammond's Reply 3.)

59. As the United States District Court for the Southern District of New York stated in evaluating investors' claims against third parties involved in the well-known Bernard Madoff Ponzi scheme cases, "claims that arise in the aftermath of a Ponzi scheme are classic examples of generalized harm." *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321, 336 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016) (per curiam); *see also Bash v. Textron Fin. Corp. (In re Fair Fin. Co.)*, 834 F.3d 651, 676 (6th Cir. 2016); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 598 B.R. 102, 112–17 (S.D.N.Y. 2019); *A & G Goldman P'ship v. Capital Growth Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 565 B.R. 510, 522–25 (S.D.N.Y 2017), *aff'd sub nom.*, *A&G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 739 F. App'x 679 (2d Cir 2018); *Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469, 479–80 (S.D.N.Y. 2012), *aff'd sub nom.*, *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81 (2d Cir. 2014); *Greenpond S., LLC v. Gen. Elec. Capital Corp.*, 886 N.W.2d 649 (Minn. Ct. App. 2016)

60. However, several other federal court decisions have held that Ponzi-scheme victims, and not bankruptcy trustees, have standing to assert claims against third parties where the claims are based on the third-party's conduct specifically aimed at the plaintiff-investors. *See, e.g., Picard*, 721 F.3d at 71 (concluding, on similar Ponzi scheme allegations, that the trustee lacked standing to assert "claims on behalf of

thousands of customers against thirty-party financial institutions for their handling of individual investments made on various dates in varying amounts" because the customers were all affected differently); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir.1995) (concluding that claims predicated on the distribution of misleading documents to investors in the corporation "are the property of those investors, and may be asserted only by them and to the exclusion of [the trustee]"); *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 981, 986–87 (11th Cir. 1988) (holding that defrauded investors, and not the bankruptcy trustee, had standing to bring claims arising out of bankruptcy debtor's Ponzi scheme); *cf. Marshall*, 740 F.3d at 93 (concluding that plaintiffs lacked standing because they had not alleged defendants took any "particularized actions[,]" such as "that the [defendants] made any misrepresentations to [the plaintiffs]" (internal quotation marks omitted)).[17]

61.    Accordingly, though generalized injuries among creditor-victims of Ponzi schemes may be common, the Court concludes that the fact that Plaintiffs' allegations outline a Ponzi scheme is not dispositive of the Court's inquiry.  Rather, the Court is

---

[17] Furthermore, the parties do not cite, and the Court's own research has not identified, any controlling North Carolina state court decision addressing whether a plaintiff, rather than the bankruptcy trustee, has standing to assert claims against a third party arising out of a Ponzi scheme.  At least one North Carolina federal court, the United States Bankruptcy Court for the Western District of North Carolina, has addressed this issue. *See Sigmon v. Esposito (In re Rahab Tr. & Mgmt. Co.)*, 2002 Bankr. LEXIS 1876 (Bankr. W.D.N.C. Mar. 4, 2002).  That case, however, concerned whether the trustee had standing to bring claims under 11 U.S.C. § 544, pursuant to the trustee's avoidance powers, rather than under section 541 as property of the bankruptcy estate. *Id.* at *9–10, 16–17 (holding that trustee lacked standing under section 544 to bring North Carolina state law claims on behalf of the Ponzi-scheme debtor's creditors).  Here, Defendants do not argue that only the Bankruptcy Trustee has standing pursuant to section 544; rather, they argue that Plaintiffs' claims based on investments in the Bankrupt Entities are the property of the bankruptcy estates, invoking section 541.  Accordingly, *In re Rahab Trust & Management Co.* is distinguishable from the instant Actions.

tasked with examining "the nature of the claim[s]" and determining, based on that examination, whether the claims are personal to Plaintiffs. *See Keener*, 149 N.C. App. at 26, 560 S.E.2d at 822. The Court first addresses Plaintiffs' claims against the Individual Defendants, and then proceeds to consider Plaintiffs' claims against the MetLife Defendants.

**D.      Plaintiffs' Claims Against the Individual Defendants**

62.      Plaintiffs bring claims against one or more of the Individual Defendants for fraud, constructive fraud, primary violations of the NCSA, negligent misrepresentation, and professional negligence. (*See, e.g.*, J. Aldridge Compl. ¶¶ 176–230, 255–54.) Additionally, Olin brings a claim against Lowder and Hammond for primary violations of the NCIAA. (*See* Olin Compl. ¶¶ 199–205.)

63.      Plaintiffs have standing to bring these claims against the Individual Defendants if the nature or gravamen of Plaintiffs' claims is that either (1) the injury suffered by Plaintiffs in relation to their investments in the Bankrupt Entities is personal to them and distinct from the injury sustained by the Bankrupt Entities, or (2) the Individual Defendants owed Plaintiffs a special duty. *See Newton*, 248 N.C. App. at 338, 788 S.E.2d at 659–60 (citing *Barger*, 346 N.C. at 660, 488 S.E.2d at 220–21).

64.      Regarding the distinct injury exception, the North Carolina Supreme Court has stated that "[a]n injury is peculiar or personal . . . if a legal basis exists to support plaintiffs' allegations of an individual loss, separate and distinct from any damage suffered by the corporation." *Barger*, 346 N.C. at 659, 488 S.E.2d at 220 (internal

quotation marks omitted) (quoting *Howell v. Fisher*, 49 N.C. App. 488, 492, 272 S.E.2d 19, 23 (1980)). The Court of Appeals in *Newton* applied the distinct-injury exception to permit a bankruptcy estate's creditors to pursue claims against third parties, concluding that the defendants' misrepresentations and concealment of facts regarding the financial health of a corporation subsequently put into bankruptcy induced the plaintiffs to enter into certain contracts by which the plaintiffs became creditors of the bankruptcy estate. 248 N.C. App. at 339–40, 788 S.E.2d at 661.

65. The Court finds the Court of Appeals' analysis of this issue in *Newton* to be instructive. There, the plaintiffs, who were customers, vendors, and suppliers of the bankrupt entity, brought claims for fraud and UDTP alleging that certain defendants "falsified financial statements" and repeatedly assured plaintiffs "that the company would receive additional funds and continue to perform its contractual obligations." *Id.* at 339, 788 S.E.2d at 660. Two of the defendants, the president of the bankrupt entity and his father, argued that the plaintiffs' injuries were merely "injuries to [the bankrupt entity] itself, shared by all its creditors, and therefore properly belonged to the bankruptcy trustee." *Id.* at 339, 788 S.E.2d 660–61 (citing *Ruppert Landscaping*, 187 F.3d at 441; *Gleneagles Trading, LLC v. Welsh, Carson, Anderson & Stowe, VI, LP (In re Bridge Info. Sys., Inc.)*, 344 B.R. 587, 594 (E.D. Mo. 2006)).

66. The *Newton* court rejected this argument, concluding that the plaintiffs' injuries were "separate and distinct from any injury to [the bankrupt entity] or any other creditor of the bankruptcy estate," and thus held that the fraud and UDTP

claims belonged to the plaintiffs. *Id.* at 339–40, 788 S.E.2d at 661. Crucial to the

*Newton* court's holding was its conclusion that:

> the gravamen of the [plaintiffs'] fraud and UDTP claims is not merely that they were injured by [the bankrupt entity's] collapse and the resulting breach of its contractual obligations to them, but instead that they *never would have suffered any injury* if they had not been fraudulently induced into entering into contracts with [the bankrupt entity] as a result of misrepresentations made by [the bankrupt entity's] staff acting at [the defendant-president's] direction . . ., when [the defendant-president] was already aware of the company's financial distress.

*Id.* at 339–40, 788 S.E.2d at 661 (emphasis in original). The *Newton* court also noted that the complaint detailed how the plaintiffs, the bankrupt entity's customers, vendors, and suppliers, "relied on the alleged misrepresentation when entering into their individual contracts with [the bankrupt entity] on various dates and for varying amounts, thereby resulting in injuries to themselves in their individual capacities." *Id.* at 340, 788 S.E.2d at 661. The court therefore concluded that the creditor-plaintiffs' injuries were "separate and distinct from any injury" to the bankrupt entity "or any other creditor of the bankruptcy estate[,]" and that the creditor-plaintiffs had standing to assert their claims. *Id.*

67. As the Court reads the Complaints, Plaintiffs' claims based on their investments in the Bankrupt Entities against the Individual Defendants for fraud, constructive fraud, negligent misrepresentation, violations of the NCSA, and professional negligence, and Olin's claim against Lowder and Hammond for violation of the NCIAA, are all traceable to the Individual Defendants' various alleged fraudulent and/or negligent misrepresentations, omissions, and concealment of

material facts when advising Plaintiffs to invest with Wall Street Capitol. (*See, e.g.*, J. Aldridge Compl. ¶¶ 176–230; *see also* J. Aldridge Compl. ¶¶ 57–58; K. Aldridge Compl. ¶¶ 58–59, 61; Goulet Compl. ¶¶ 57, 60; Kelly Compl. ¶¶ 62, 64; Olin Compl. ¶¶ 57–59, 61; Peterson Compl. ¶¶ 57, 60; Williams Compl. ¶¶ 59, 61.)

68. Based on these representations, and other misrepresentations and omissions set forth below, Plaintiffs allege that Siskey and the Individual Defendants, "under the guise and appearance of MetLife and Wall Street Capitol," induced Plaintiffs to invest in one or more of the Bankrupt Entities through MetLife's Wall Street Capitol office. (J. Aldridge Compl. ¶¶ 57–58; K. Aldridge Compl. ¶¶ 58–59 , 61; Goulet Compl. ¶¶ 57, 60; Kelly Compl. ¶¶ 62, 64; Olin Compl. ¶¶ 58–59, 61; Peterson Compl. ¶¶ 57, 60; Williams Compl. ¶¶ 59, 61.)

69. J. Aldridge invested in all four of the Bankrupt Entities—TSI Holdings, WSC Holdings, SRP, and SPP, (J. Aldridge Compl. ¶ 128), although the J. Aldridge Complaint provides details about investments in only two of the entities—WSC Holdings and SPP, (*see* J. Aldridge Compl. ¶¶ 128–42). He initially invested $259,000 into Premier II in 2001. Siskey subsequently advised him that he had to transfer his investment in Premier II to WSC Holdings. (J. Aldridge Compl. ¶¶ 128, 131.). In this connection, J. Aldridge alleges that Lowder falsely represented that he would make a ten percent return on any investment he transferred to WSC Holdings and "specifically made statements to [J. Aldridge that] there was 'no risk.'" (J. Aldridge Compl. ¶ 132.) On the basis of these alleged misrepresentations, J. Aldridge permitted the transfer of his $259,000 investment in Premier II to WSC Holding in

2003. (*See* J. Aldridge Compl. ¶ 128.) Regarding SPP, J. Aldridge alleges that Siskey and Lowder falsely represented to him that he would receive a "4% fixed guaranteed rate of return" on any investment in that entity. (J. Aldridge. Compl. ¶ 134.) Relying on this information, J. Aldridge invested $50,000 in SPP on September 11, 2014. (J. Aldridge Compl. ¶ 135.)

70.     K. Aldridge alleges that she was induced by Siskey, Lowder, and Hammond to invest $100,000.00 of her life savings in WSC Holdings on April 12, 2016. (K. Aldridge Compl. ¶¶ 138, 140; *see* K. Aldridge Compl. ¶ 124.) She asserts that Siskey, Lowder, and Hammond each made false statements to her in April 2016 that an investment in WSC Holdings was a "guaranteed and safe investment with guaranteed [and fixed] rates of return" when, in fact, the money was deposited into other accounts for Siskey's personal use. (K. Aldridge Compl. ¶¶ 138, 141.) K. Aldridge further alleges that Lowder, Hammond, and Siskey falsely represented to her that the check she wrote to WSC Holdings on April 12, 2016 would be invested in WSC Holdings, a legitimate company. (K. Aldridge Compl. ¶ 148; *see* K. Aldridge Compl. ¶¶ 142, 146.)

71.     Turning to Goulet, based on Siskey's and Hammond's representations, including Siskey's assertion that Goulet was "guaranteed" a 3.9% rate of return on his investment so long as he kept the funds invested for one year, on April 8, 2015, Goulet alleges he was induced to invest $420,000.00 in TSI Holdings. (Goulet Compl. ¶¶ 120–21.)

72. Kelly alleges that, in reliance on Phillips's and Siskey's misrepresentations and/or omissions, he was induced to invest in TSI Holdings and SRP. (Kelly Compl. ¶¶ 119–20, 124, 133, 135.) Kelly made three investments in TSI Holdings—on June 23, 2015, July 28, 2015, and November 20, 2015—totaling $305,227.00. (Kelly Compl. ¶¶ 119–21, 124.) "Based on the same false representations," Kelly alleges Siskey and Phillips induced him to invest $100,000.00 in SRP. (Kelly Compl. ¶¶ 129–30.) According to Kelly, Siskey and Phillips misrepresented, both orally and in writing, the value of SRP's ownership interest in the Wall Street Capitol building against its debt liability by millions of dollars. (Kelly Compl. ¶ 130.) He avers that Siskey and Phillips provided him with a written statement materially misrepresenting that the building was valued at $23.2 million when in fact it was worth substantially less. (Kelly Compl. ¶ 130.)

73. Leite alleges that, in 2015 and 2016, Phillips met with him and, as a MetLife and Wall Street Capitol representative, "convinced . . . Leite to invest thousands of dollars of his life savings in the [Ponzi Scheme,] which [Phillips] represented [was] 'guaranteed.'" (Kelly Compl. ¶¶ 145–47, 161.) Allegedly on the basis of these representations, Leite invested $100,000 in WSC Holdings on August 15, 2016. (Kelly Compl. ¶¶ 148–49.)

74. In reliance on Phillips' and Siskey's misrepresentations and omissions, Reittinger alleges he was induced by Siskey and Phillips to invest $100,000.00 in WSC Holdings on August 12, 2016. (Kelly Compl. ¶¶ 174–75, 187.)

75. The Lemonses allege that, by their misrepresentations and omissions, Siskey and Phillips induced them each to invest $100,000.00 in WSC Holdings on April 5, 2016 by transferring funds from their respective IRAs. (Kelly Compl. ¶¶ 200, 202–04, 213, 226, 228–30, 238.)

76. On August 8, 2010, Olin received $773,299.24 from an asset sale related to an investment previously made with Wall Street Capitol. (Olin Compl. ¶ 131.) According to Olin, two months later, Siskey advised Olin to invest the proceeds in TSI Holdings, representing to Olin that he would earn a "guaranteed 5% rate of return." (Olin Compl. ¶ 132.) These statements were made in the MetLife offices in the presence of Lowder and Hammond, who purportedly also represented to Olin that investments made with Wall Street Capitol were "guaranteed" with a fixed rate of return and used these meetings to sell Olin and his wife MetLife insurance policies. (Olin Compl. ¶¶ 132, 146, 150.) Based on these alleged misrepresentations, Olin alleges he invested twice in TSI Holdings, first investing $500,000 on October 7, 2010 and then investing another $200,000 on January 14, 2014. (Olin Compl. ¶¶ 120, 132, 133; *see* Olin Compl. ¶ 152.)

77. Peterson alleges that, based on Hammond's misrepresentations and omissions, he met with Siskey about investing in SRP on or about April 21, 2016, at which point Siskey misrepresented that SRP's debt liability was only $5 million when it was actually $8.25 million. (Peterson Compl. ¶ 123.) Peterson alleges that he was induced to invest $225,000.00 in SRP based on these misrepresentations and omissions. (Peterson Compl. ¶ 122.)

78.     The Williamses allege that "[u]nder MetLife's assumed name of Wall Street Capitol," Siskey and Phillips induced them to invest $50,000.00 each in SRP on May 31, 2016 by overstating, both orally and in writing, the value of SRP's ownership interest in the Wall Street Capitol building against its debt liability by millions of dollars. (Williams Compl. ¶¶ 117–18, 134–35; *see* Williams Compl. ¶¶ 122, 138.) Specifically, they allege that Siskey and Phillips provided them with an erroneous written statement that the building carried $5 million in debt when it in fact carried $8.25 million in debt. (Williams Compl. ¶¶ 118, 135.) The Williamses also allege that Siskey and Phillips misrepresented to the Williamses that their investments in SRP would achieve "[l]iquidity within 6 months (guaranteed by [] Siskey and [SRP])." (Williams Compl. ¶¶ 118, 135.)

79.     Several of the Plaintiffs allege that, after investing in the Bankrupt Entities, they received verbal assurances and/or written statements, which they believed were from Wall Street Capitol/MetLife, falsely stating that their investments were guaranteed, safe, and/or had appreciated in value. (*See* J. Aldridge Compl. ¶¶ 160–61; K. Aldridge Compl. ¶¶ 142–43, 149; Kelly Compl. ¶¶ 123, 152–53, 178–79, 205–06, 231–32; Olin Compl. ¶¶ 122, 127; Williams Compl. ¶¶ 125, 139.) Additionally, Plaintiffs allege that the Individual Defendants (as well as Siskey) omitted and concealed Siskey's disciplinary history when inducing them to invest in the Bankrupt Entities. (*See* J. Aldridge Compl. ¶¶ 137–38, 171, 173; K. Aldridge Compl. ¶ 122; Goulet Compl. ¶ 119; Kelly Compl. ¶¶ 122, 151, 177, 212, 237; Olin Compl. ¶¶ 151, 154; Peterson Compl. ¶¶ 119, 122; Williams Compl. ¶¶ 121, 137.)

Plaintiffs each assert that they would not have invested in the Bankrupt Entities had they known this information. (*See* J. Aldridge Compl. ¶ 139; K. Aldridge Compl. ¶ 158; Goulet Compl. ¶ 125; Kelly Compl. ¶¶ 142, 167, 193, 219, 244; Olin Compl. ¶ 160; Peterson Compl. ¶ 125; Williams Compl. ¶¶ 129, 145.)

80. J. Aldridge, K. Aldridge, Goulet, Kelly, Leite, Reittinger, the Lemonses, and Olin allege their damages resulted in part from their investments in one or more of TSI Holdings, WSC Holdings, and SPP being subject to *pro rata* distributions in the Bankruptcy Proceedings. (J. Aldridge Compl. ¶ 167; K. Aldridge Compl. ¶ 145; Goulet Compl. ¶ 124; Kelly Compl. ¶¶ 128, 155, 164, 181, 209, 216, 234, 241; Olin Compl. ¶ 135.) Kelly, Peterson, and the Williamses allege their damages resulted in part from the Bankruptcy Trustee's sale of SRP's interest in the Wall Street Capitol office for well below its represented value. (Kelly Compl. ¶ 130; Peterson Compl. ¶ 126; Williams Compl. ¶¶ 118, 135.)

81. However, the gravamen of Plaintiffs' claims against the Individual Defendants is not merely that they were injured by the destruction of the value of their investments in the Bankrupt Entities by Siskey's perpetration of the Ponzi Scheme, but rather, like the creditors in *Newton*, that they "*never would have suffered any injury*" if they had not been induced to invest in these entities by the Individual Defendants' (and Siskey's) fraudulent and/or negligent misrepresentations and omissions/concealment. *See Newton*, 348 N.C. App. at 340, 788 S.E.2d at 661 (emphasis in original). This is precisely the kind of distinct and separate injury recognized in *Newton*. *See id.* at 339–40, 788 S.E.2d at 661.

82.     The Individual Defendants attempt to avoid this conclusion by arguing that the only direct injury was to the Bankrupt Entities and Plaintiffs' injuries were derivative in nature.  The *Newton* court considered and rejected a similar argument there, reasoning that, while the bankrupt entity was surely injured by the defendants' conduct, the creditor-plaintiffs sustained individualized injuries because they had been fraudulently induced into entering the contracts at issue.  *See* 248 N.C. App. at 339–40, 788 S.E.2d at 661.

83.     The Court finds the Individual Defendants' similar argument unavailing. The Individual Defendants' alleged conduct inducing Plaintiffs to invest in the Bankrupt Entities, if it harmed the Bankrupt Entities at all, also harmed Plaintiffs "in their individual capacities."  *Id.* at 340, 778 S.E.2d at 661; *see also In Re Seven Seas Petroleum*, 522 F.3d at 585 ("[I]t is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct."); *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988) ("Put simply, if [the plaintiff-creditor] was injured by defendants' acts . . . it has standing to bring [its] claim, regardless of the fact that [the debtor estate] might also have suffered an identical injury for which it has a similar right of recovery." (internal citation omitted)).

84.     Additionally, the Individual Defendants argue that the claims brought against them "are not unique to Plaintiff[s]" because Plaintiffs in all of the Complaints "have asserted numerous identical allegations" describing "losses arising from an alleged failure to disclose the exact same facts and describing the exact same

general injury as that experienced by every other investor in" the Ponzi Scheme. (Lowder & Hammond's Br. Supp. 12–13; Phillips's Br. Supp. 6; *see* Phillips's Reply 3–4.) In other words, the Individual Defendants argue that Plaintiffs suffered common injuries based on the Individual Defendants' alleged common acts, and thus Plaintiffs' claimed injuries cannot be personal or particular to them.

85. The Court also finds this argument unpersuasive. Implicit in the Individual Defendants' argument is that if Plaintiffs suffered the same type of injury based on the same type of actions by the Individual Defendants, Plaintiffs' injuries cannot be personal to them. The Court does not read the relevant case law this way. *Newton* itself was a class action, and yet the fact that the defendants, and their employees, made the same *types* of misrepresentations to, and concealed the same *types* of information from, the creditor-plaintiffs—a prerequisite to Rule 23 class certification—did not foreclose the creditor-plaintiffs' standing where they were induced to enter "into their individual contracts with [the bankrupt entity] on various dates and for varying amounts[.]" 248 N.C. App. at 340, 788 S.E.2d at 661; *see also Hirsch*, 72 F.3d at 1094 (concluding that claims predicated on the distribution of misleading private placement memoranda to investors in the corporation "are the property of those investors, and may be asserted only by them and to the exclusion of [the trustee]"). Here, Plaintiffs, allegedly relying on the Individual Defendants' misrepresentations, omissions, and/or concealment, made individual investments in the bankrupt entities "on various dates and for varying amounts, thereby resulting in injuries to themselves in their individual capacities." *Id.*

86. For these reasons, the Court concludes that Plaintiffs have standing to assert their claims based on investments in the Bankrupt Entities, under *Newton*'s personal and distinct injury exception. *Newton*, 248 N.C. App. at 339–40, 788 S.E.2d at 661. As a result, the Court need not, and does not, address whether Plaintiffs have standing to bring their claims against the Individual Defendants under the special-duty exception.

87. The Court's conclusion is supported by decisions from this State's federal and state courts in addition to *Newton*. *See, e.g., Angell*, 336 F. Supp. 2d at 547 (concluding that claims for fraud, negligent misrepresentation, and unfair and deceptive trade practices based on the defendants' assurances, which were made directly to the plaintiffs to induce them to execute merger documents, were "factually unique" to the plaintiffs); *In re Midstate Mills*, 2015 Bankr. LEXIS 3105, at *15, 17−18 (acknowledging that, if the plaintiffs could plead "individualized harm rooted in specific misrepresentations made to them personally," the plaintiffs would have standing to pursue claims under North Carolina law); *Lillian Knitting Mills Co. v. Earle*, 233 N.C. 74, 76, 62 S.E.2d 492, 493 (1950) (concluding that an individual creditor could maintain a claim based on fraudulent misrepresentations made directly to that creditor).

88. The Court's conclusion is further supported by decisions of courts in other jurisdictions dealing with similar facts. *Picard*, 721 F.3d at 71 (concluding, on similar Ponzi scheme allegations, that the trustee lacked standing to assert "claims on behalf of thousands of customers against thirty-party financial institutions for their

handling of individual investments made on various dates in varying amounts" because the customers were all affected differently); *Hirsch*, 72 F.3d at 1094 (concluding that claims predicated on the distribution of misleading documents to investors in the corporation "are the property of those investors, and may be asserted only by them and to the exclusion of [the trustee]"); *cf. Marshall*, 740 F.3d at 93 (concluding that plaintiffs lacked standing where they had not alleged defendants took any "particularized actions[,]" such as "that the [defendants] made any misrepresentations to [the plaintiffs]" (internal quotation marks omitted)).

89.     Accordingly, the Court determines that the Individual Defendants' Motions seeking dismissal of Plaintiffs' claims under the "first crack" doctrine should be, and are, DENIED.

E.     **Plaintiffs' Claims Against the MetLife Defendants**

90.     Plaintiffs bring claims against the MetLife Defendants for fraud, constructive fraud, violation of the NCSA, negligent misrepresentation, negligence, and vicarious liability. (*See, e.g.*, J. Aldridge Compl. ¶¶ 176–225, 231–38, 249–54.) Additionally, Olin brings a claim against the MetLife Defendants for violation of the NCIAA. (*See* Olin Compl. ¶¶ 206–09.)

1.     **Vicarious Liability**

91.     In their claim for vicarious liability on the basis of *respondeat superior*, Plaintiffs allege that the MetLife Defendants are liable for the "foregoing claims for relief" as a result of Siskey's and the Individual Defendants' actions as employees and

agents of MetLife and Wall Street Capitol. (*See, e.g.*, J. Aldridge Compl. ¶ 251.)[18]

Plaintiffs' use of the phrase "foregoing claims for relief" creates some confusion because, based on the order of the claims in the Complaints, the "foregoing claims for relief" include claims brought only against the MetLife Defendants—i.e., Plaintiffs' claims for negligence. Moreover, Plaintiffs specifically identify fraud, constructive fraud, and (primary) violations of the NCSA (section 78A-56(a)(2)) (and Olin identifies his claim for violation of the NCIAA (section 78C-38(a)(2))),[19] as claims for which MetLife is vicariously liable. (J. Aldridge Compl. ¶ 253; Olin Compl. ¶ 249.). This list, however, omits Plaintiffs' claims for negligent misrepresentation.

92. This inconsistency notwithstanding, the Court considers each Complaint as a whole and, for purposes of the Motions, treats Plaintiffs' claims for vicarious

---

[18] In this subsection IV.E, the Court cites only to the J. Aldridge Complaint for allegations representative of those alleged across all the Complaints. For Olin's claims under the NCIAA, which only Olin asserts, and allegations relevant thereto, the Court cites to the Olin Complaint.

[19] At least one opinion of this Court has applied agency principles, including the doctrine of *respondeat superior*, to claims arising under section 78A-56(a)(2) (primary liability) of the NCSA. *See Atkinson v. Lackey*, 2015 NCBC LEXIS 21, at *18–19 (N.C. Super. Ct. Feb. 27, 2015) ("It is undisputed that Mehler was authorized to manage and solicit investments on behalf of the Pacific Fund by virtue of his management role in Pacific Capital. It is also undisputed that Mehler was acting at all times within the scope of the authority provided to him by Pacific Capital and that Mehler directly solicited Plaintiffs' investments in the Pacific Fund. Accordingly, the Court concludes that Pacific Capital is an offeror or seller under the NCSA on the undisputed evidence of record." (internal citations omitted)). Furthermore, this Court has analyzed claims for primary liability under the NCSA and for primary liability under the NCIAA similarly. *Compare Austin v. Regal Inv. Advisors, LLC*, 2018 NCBC LEXIS 3, *40–47 (N.C. Super. Ct. Jan. 8, 2018) (analyzing primary liability under section 78A-56(a)(2) of the NCSA), *with id.* at *52–53 (analyzing primary liability under sections 78C-38(a)(1), (a)(2) of the NCIAA). Accordingly, for purposes of the Court's standing analysis, it is assumed that a party may assert a claim for vicarious liability against a defendant-principal for its agent's primary violations of the NCSA and NCIAA.

liability as attempting to impose liability on the MetLife Defendants for all claims brought against the Individual Defendants.

93.     "It is elementary that the principal is liable for the acts of his agent, whether malicious or negligent, . . . when the agent or servant is acting within the line of his duty and exercising the functions of his employment." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 297, 603 S.E.2d 147, 157 (2004) (quoting *Thrower v. Coble Dairy Prods. Coop., Inc.*, 249 N.C. 109, 111–12, 105 S.E.2d 428, 430 (1958)). Accordingly, "[w]hen an employee commits a tort while acting within the scope of his employment, the tort can be imputed to the employer under the doctrine of *respondeat superior*." *Estate of Redding v. Welborn*, 170 N.C. App. 324, 330, 612 S.E.2d 664, 668 (2005); *see Greensboro Hous. Auth. v. Kirkpatrick & Assocs.*, 56 N.C. App. 400, 403, 289 S.E.2d 115, 117 (1982) ("The general rule is that a principal is chargeable with, and bound by, the knowledge of or notice to his agent received while the agent is acting as such within the scope of his authority and in reference to a matter over which his authority extends, although the agent does not in fact inform his principal thereof."); *Overton v. Henderson*, 28 N.C. App 699, 701, 222 S.E.2d 724, 726 (1976) ("The principal is liable for the acts of his agent, whether malicious or negligent[.]").

94.     Plaintiffs allege that Siskey and the Individual Defendants were employees and agents of MetLife.  Plaintiffs assert that, even after his fines and suspensions by regulatory authorities arising from arguably serious misconduct, Siskey, with MetLife's knowledge and consent, continued to do the same work he had always done at MetLife, indicating that this work was "an integral part of the business of MetLife

[and that] the relationship had been permanent for many years." (*See, e.g.*, J. Aldridge Compl. ¶¶ 87–89; *see also, e.g.*, J. Aldridge Compl. ¶¶ 67–85.) Moreover, Plaintiffs allege that MetLife provided the facilities and equipment used by Siskey (and the Individual Defendants), had supervision and control of him, required him to follow MetLife policies, and had to approve certain paperwork and transactions he undertook. (*See, e.g.*, J. Aldridge Compl. ¶ 89.) Further, Plaintiffs allege that Siskey "did not have the freedom to adopt certain methods of doing work over MetLife's compliance rules and policies[.]" (*See, e.g.*, J. Aldridge Compl. ¶ 90.) The Complaints are also replete with allegations that the Individual Defendants were employees and agents of MetLife who sold securities and provided investment and other financial advice to Plaintiffs. (*See, e.g.*, J. Aldridge Compl. ¶¶ 25–29, 32–33, 35–39, 250.)

95. As detailed above in section V.D, Plaintiffs allege that Siskey and the Individual Defendants, as Plaintiffs' investment and financial advisors, encouraged Plaintiffs to invest in the Bankrupt Entities. The Court concludes that Plaintiffs have sufficiently alleged, for purposes of the Court's standing analysis, that Siskey and the Individual Defendants were acting within the scope of their employment and/or agency with the MetLife Defendants when they induced Plaintiffs to invest in the Bankrupt Entities through fraudulent and/or negligent misrepresentations.

96. The Court has concluded that Plaintiffs have standing to assert their claims for fraud, constructive fraud, negligent misrepresentation, primary violations of the NCSA, primary violations of the NCIAA (Olin only), and professional negligence against the Individual Defendants. Because the alleged actions of Siskey and the

Individual Defendant giving rise to Plaintiffs' personal and distinct injuries relating to their investments in the Bankrupt Entities may be imputed to MetLife, *see Estate of Redding*, 170 N.C. App. at 330, 612 S.E.2d at 668, the Court concludes that Plaintiffs have standing to assert these claims on a *respondeat superior* theory of liability against the MetLife Defendants. The MetLife Defendants may not use the Bankruptcy Proceedings to "immunize them[selves] from liability" for their agents' and employees' fraudulent and negligent actions. *See Newton*, 248 N.C. App. at 340, 788 S.E.2d at 661.

97. Accordingly, the MetLife Motions should be, and are, DENIED to the extent they seek dismissal of Plaintiffs' claims for vicarious liability under the "first crack" doctrine.

### 2. Violations of the NCSA and NCIAA

98. Article 7 of the NCSA provides for civil liability that may be "primary" or "secondary." N.C.G.S. § 78A-56(a)(1)–(2), (c); *see also Piazza v. Kirkbride*, 246 N.C. App 576, 596, 785 S.E.2d 695, 708 (2016), *aff'd in part and modified in part*, 372 N.C. 137, 827 S.E.2d 479 (2019).

99. Based on the Court's reading of the Complaints, Plaintiffs do not attempt to impose primary liability under section 78A-56(a)(2) on the MetLife Defendants, except through their vicarious liability claim premised on Siskey's and the Individual Defendants' primary liability. Rather, Plaintiffs' NCSA claims seek to hold the MetLife Defendants secondarily liable under section 78A-56(c)(1). (*See, e.g.*, J. Aldridge Compl. ¶¶ 198–210.) Accordingly, the Court limits its consideration of the

MetLife Motions to whether Plaintiffs have standing to assert claims brought for secondary liability under section 78A-56(c)(1).

100. The NCSA's secondary liability provision provides:

> Every person who directly or indirectly controls a person liable under subsection (a), (b), or (b1) of this section, every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the sale is also liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

N.C.G.S. 78A-56(c)(1).

101. Thus, a plaintiff bringing a claim for secondary liability under section 78A-56(c)(1) "must first plead a primary violation" under section 78-56(a)(2). *Austin*, 2018 NCBC LEXIS 3, at *47. As discussed above, the Court has concluded that Plaintiffs have standing to bring their claims for primary violations under section 78A-56(a)(2) against the Individual Defendants.

102. "In addition, a plaintiff must prove that the defendant fits within the category of persons specified in [section] 56(c)(1), which includes [e]very person who directly or indirectly controls a person liable under subsection (a), (b), or (b1) of'" section 78A-56. *Id.* (internal citations and quotation marks omitted) (second alteration in original). Plaintiffs allege that the MetLife Defendants "exercised direct control over their employees," including Siskey and the Individual Defendants, "as sellers or offerors with regard to securities transactions conducted with customers of the Wall Street Capitol branch of MetLife and therefore exercised control over" Siskey

and the Individual Defendants under section 78A-56(c)(1). (*See, e.g.*, J. Aldridge. Compl. ¶ 206.) Plaintiffs further allege the MetLife Defendants were specifically aware of Siskey's disciplinary history. (*See, e.g.*, J. Aldridge Compl. ¶ 207.)

103. Olin alone asserts a claim against the MetLife Defendants for secondary violations of the NCIAA. (*See* Olin Compl. ¶¶ 206–09.) "The NCIAA, like the NCSA, creates a private cause of action against persons who commit primary violations of the NCIAA and for persons who are liable as control persons." *Austin*, 2018 NCBC LEXIS 3, at *50 (citing N.C.G.S. § 78C-38(a)–(b)). The NCIAA imposes primary liability on:

(a) Any person who:

(1) Engages in the business of advising others, for compensation, either directly or through publications or writing, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities, in violation of [N.C.G.S. §] 78C-8(b), . . . or

(2) Receives directly or indirectly, any consideration from another person for advice as to the value of securities or their purchase or sale, whether through the issuance of analyses, reports or otherwise and employees any device, scheme, or artifice to defraud such other person or engages in any act, practice or course of business which operates or would operate as a fraud or deceit on such other person in violation of [N.C.G.S. § 78C-8(a)(1) or (2). . . .

N.C.G.S. § 78C-38(a). The Court has concluded that Olin has standing to assert claims against Lowder and Hammond for primary violations of the NCIAA.

104. The secondary liability provision of the NCIAA states in pertinent part that:

(b)(1) Every person who directly or indirectly controls a person liable under subsection (a) of this section, including every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the conduct giving rise to the liability is liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

N.C.G.S. § 78C-38(b)(1). Olin alleges that "the MetLife Defendants d/b/a Wall Street Capitol directly or indirectly controlled" Siskey, Lowder, and Hammond, "from 2000 through 2016." (Olin Compl. ¶ 207.)

105. The secondary liability provisions of the NCSA and the NCIAA provide for liability as to two classes of persons: (i) control persons; and (ii) dealers or salesmen "who materially aid[]" in the sale of securities or the conduct giving rise to primary liability  N.C.G.S. § 78A-56(c)(1); *id.* § 78C-38(b)(1).  As to control person liability, "the statute does not provide a manner for determining 'who directly or indirectly controls' a primarily liable person." *Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2018 NCBC LEXIS 13, at *68–69 (N.C. Super. Ct. Feb. 9, 2018).  However, "this Court has previously looked to 'analogous federal control person liability statutes, such as 15 U.S.C. § 77o, when interpreting [section 78A-56(c)].'" *Id.* at *69 (alteration in original) (quoting *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 2013 NCBC LEXIS 11, at *41 (N.C. Super. Ct. Feb. 19, 2013)). "Federal courts often invoke a two-part test to determine control person liability under section 77o." *Atkinson*, 2015 NCBC LEXIS 21, at *30. "First, the 'control person' needs to have *actually* exercised general control over the operations of the wrongdoer, and second, the

control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911–12 (7th Cir. 1994) (emphasis in original).

106. Whether a creditor-plaintiff may have standing to assert claims against a third party for control person liability under sections 78A-56(c)(1) and 78C-38(b)(1) has not been addressed by our State's courts, and the parties' briefing provides no guidance on this issue.

107. At least one federal court, however, has addressed this issue in the Ponzi-scheme/bankruptcy context. *See A & G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*, 2013 U.S. Dist. LEXIS 143956 (S.D.N.Y Sept. 30, 2013). In that case, a group of plaintiffs sought to bring federal securities fraud claims premised on a control person theory of liability against third parties. *Id.* at *7–8, 20–26. The court first recognized that the creditor-plaintiffs "could conceivably assert non-derivative securities claims [against third parties] based on control person liability . . . [i]f the [] [c]omplaints plead[ed] bona fide securities fraud claims resulting in injuries to investors[,]" such as the creditor-plaintiffs. *Id.* at *18–19. As alleged, however, the claims pleaded "nothing more than that the [third-parties] traded on their *own* [bankrupt entity] accounts, knowing that such 'trades' were fraudulent, and then withdrew the 'proceeds' of such falsified transactions from [the bankrupt entity]." *Id.* at 23 (emphasis in original). Accordingly, the court concluded that the claims were nothing more than disguised fraudulent transfer claims—derivative of

claims the bankruptcy trustee could bring —which only the bankruptcy trustee could bring against the third parties. *Id.* at 27.

108. The facts as alleged in the instant Complaints are considerably different. The Complaints in these Actions contain no allegations that the MetLife Defendants traded on their own accounts with the Bankrupt Entities or that such accounts existed. Furthermore, Plaintiffs do not allege that the MetLife Defendants transferred funds from the Bankrupt Entities to themselves or anyone else—they allege that only Siskey made such transfers. Rather, Plaintiffs allege that the MetLife Defendants employed, supervised, and controlled Siskey and the Individual Defendants as investment advisors and offerors and sellers of securities during the relevant time period and with respect to Plaintiffs' investments in the Bankrupt Entities. Without considering or deciding whether Plaintiffs' allegations are sufficient to withstand a motion under Rule 12(b)(6), the Court concludes that for purposes of its standing analysis, Plaintiffs have sufficiently alleged that the MetLife Defendants fall within the meaning of "person[s] who directly or indirectly control[]" under the NCSA and NCIAA.

109. The Court therefore concludes that Plaintiffs' claims against the MetLife Defendants under section 78A-56(c)(1) and Olin's claim under section 78C-38(b)(1) are bona fide claims for control person liability which Plaintiffs' have standing to bring.

110. This reasoning is bolstered by a comparison to the Court's analysis of Plaintiffs' claims for vicarious liability. Though vicarious liability on a theory of

*respondeat superior*, on the one hand, and control person liability under the NCSA and NCIAA, on the other, are clearly distinct, they have in common that one party may be liable for the conduct of another party depending on the parties' relationship to one another. *See* N.C.G.S. § 78A-56(c)(1); *id.* at 78C-38(b)(1); *Atkinson*, 2015 NCBC LEXIS 21, at *17 ("If [p]laintiffs can prove that an offerer or seller has primary liability under [section] 78A-56(a)(2), secondary liability *will lie* for '[e]very person who directly or indirectly controls [that person.]'" (third and fourth alterations in original) (emphasis added)).

111.    Plaintiffs also seek to hold the MetLife Defendants liable under section 78A-56(a)(2) as aiders and abettors of Siskey's and the Individual Defendants' alleged securities fraud.[20] (*See, e.g.*, J. Aldridge Compl. ¶ 208.)  This Court has stated that "materially aid[ing]" a primary violator should "require allegations of conduct which rises to the level of having contributed substantial assistance to the act or conduct leading to primary liability under the NCSA[.]" *Highwoods Realty*, 2013 NCBC LEXIS 11, at *49.  Here, Plaintiffs allege that the MetLife Defendants materially aided the Individual Defendants' violations of section 78A-56(a)(2) "by actively concealing the known facts of [ ] Siskey's illegal actions from" the Plaintiffs. (*See, e.g.*, J. Aldridge Compl. ¶ 208.)  The Court concludes that the reasoning applied to Plaintiffs' claims for control person liability are also applicable to Plaintiffs' claims for aiding and abetting liability under the NCSA and leads to the same result.

---

[20] Olin does not appear to allege an aiding and abetting theory of secondary liability against the MetLife Defendants under the NCIAA.  (*See* Olin Compl. ¶¶ 206–09.)

112.  The Court therefore concludes, again without deciding whether Plaintiffs' allegations survive scrutiny under Rule 12(b)(6), that Plaintiffs have standing to assert their claims for secondary liability under the NCSA, and Olin has standing to assert his claim for secondary liability under the NCIAA.  Accordingly, the MetLife Motions should be, and are, DENIED to the extent they seek dismissal of these claims under the "first crack" doctrine.

### 3.  Fraud, Constructive Fraud, and Negligent Misrepresentation

113.  As noted above, Plaintiffs' fraud, constructive fraud, and negligent misrepresentation claims are each traceable to the Individual Defendants' and Siskey's alleged conduct in inducing Plaintiffs to invest in the Bankrupt Entities through fraudulent and or negligent misrepresentations and/or omissions.  Plaintiffs bring these same claims directly against the MetLife Defendants.  (*See, e.g.*, J. Aldridge Compl. ¶¶ 176–90.)  The gist of Plaintiffs' claims against the MetLife Defendants is that the MetLife Defendants allegedly knew of Siskey's disciplinary history and, through their own internal investigations, knew about alleged illegal conduct involving securities transactions at the Wall Street Capitol office, but, rather than inform Plaintiffs, concealed these facts.  (*See, e.g.*, J. Aldridge Compl. ¶¶ 182–88.)

114.  The Court concludes that Plaintiffs lack standing to assert their claims for fraud, constructive fraud, and negligent misrepresentation directly against the MetLife Defendants based on their omission-and-concealment theory of liability.

115. First, Plaintiffs have not alleged a personal or particularized injury on the basis of the MetLife Defendants' omissions and concealment. While the *Newton* court specifically found such injuries when the defendants made *misrepresentations*, coupled with concealment of the company's financial condition to induce the plaintiffs to become creditors, 248 N.C. App. at 339–40, 788 S.E.2d at 661, Plaintiffs here do not allege that they were induced to invest in the Bankrupt Entities through any misrepresentations directly by the MetLife Defendants.

116. The only statements Plaintiffs' identify as allegedly made by the MetLife Defendants are that: (i) Siskey and others at the Wall Street Capitol office were trusted and reputable, (*see, e.g.*, J. Aldridge Compl. ¶¶ 38, 119, 121–22, 182, 186); and (ii) periodic account statements were sent by MetLife d/b/a Wall Street Capitol, (*see, e.g.*, J. Aldridge Compl. ¶ 182). As to the former, though these statements may have contributed to Plaintiffs' decisions to seek financial and investment advice from Siskey and the Individual Defendants, Plaintiffs do not allege that the statements *induced* Plaintiffs to invest in the Bankrupt Entities. As to the latter, by Plaintiffs' own allegations, the statements were made and/or sent by the MetLife Defendants *after* Plaintiffs invested in the Bankrupt Entities and thus could not have induced their investments. Accordingly, the Court concludes Plaintiffs lack standing to assert these claims against the MetLife Defendants under *Newton*'s direct-injury exception.

117. Having determined that Plaintiffs do not have standing to assert their claims against the MetLife Defendants for fraud, constructive fraud, and negligent misrepresentation under *Newton*'s direct-injury exception, the Court now considers

whether Plaintiffs have standing to bring these claims under the special-duty exception. The Court concludes that Plaintiffs do not.

118. Our Supreme Court has held that to qualify as a special duty under *Barger*, the duty must be "personal to" Plaintiffs. *Green v. Freeman*, 367 N.C. 136, 143, 749 S.E.2d 262, 269 (quoting *Barger*, 346 at 661, 488 S.E.2d at 221). Our courts have recognized that special duties exist in the shareholder context in a variety of circumstances, including, but not limited to, "when the wrongful actions of a party induced an individual to become a shareholder; when a party violated its fiduciary duty to the shareholder; when the party performed individualized services directly for the shareholder; and when a party undertook to advise shareholders independently of the corporation." *Barger*, 346 N.C. at 220, 488 S.E.2d at 659 (and noting this list "is illustrative" and "not an exclusive list of all factual situations in which a special duty may be found"). These same "illustrative" circumstances have been applied in the creditor context. *See, e.g.*, *Green*, 367 N.C. at 143, 749 S.E.2d at 269.

119. Based on its review of the Complaints here, the Court concludes that Plaintiffs have failed to plead that the MetLife Defendants owed Plaintiffs a special duty sufficient to create standing. To the contrary, all Plaintiffs have alleged to show such a duty is that the MetLife Defendants knew of the Ponzi Scheme and failed to advise Plaintiffs of Siskey's disciplinary history. Otherwise, Plaintiffs' rely on their conclusory allegation that the MetLife Defendants owed them "a duty of care when providing [them] with information regarding investment and financial advice[.]"

(*See, e.g.*, J. Aldridge Compl. ¶ 213.) Such is not enough. *Cf. In re Midstate Mills*, 2015 Bankr. LEXIS 3105, at \*23–24 (concluding that allegations that defendants breached their fiduciary duty to creditor-plaintiffs in circumstances amounting to a winding up or dissolution of the bankrupt entity were sufficient to support creditor-plaintiffs' standing)*; Keener Lumber*, 149 N.C. App. at 26, 560 S.E.2d at 822 (same).

120. Furthermore, Plaintiffs allege in their constructive fraud claims that the MetLife Defendants owed them a fiduciary duty and breached this duty. (*See, e.g.*, J. Aldridge Compl. ¶ 193.) "For breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Green*, 367 N.C. at 141, 749 S.E.2d at 268. The Court need not decide, however, for purposes of resolving the standing issue, whether Plaintiffs' adequately allege that there was a fiduciary relationship between the MetLife Defendants and Plaintiffs. Even if the MetLife Defendants owed Plaintiffs a fiduciary duty and breached that duty, the MetLife Defendants' conduct—omitting and concealing Siskey's disciplinary history and the Ponzi Scheme—would have affected all MetLife customers who invested in the Bankrupt Entities in the same way. *See Associated Hardwoods*, 2018 NCBC LEXIS 81, at \* 19–20 (concluding creditors lacked standing to assert claims against third parties for funds owed from a bankrupt entity where the creditors' allegations of breach of fiduciary duty revealed that they were treated similarly to all other creditors). Here, Plaintiffs "make[] no allegation[s] that [they were] treated any differently" by the MetLife Defendants "than other [ ] creditors of" the Bankrupt Entities. *Id.*

121. The Court therefore concludes that these claims are the property of the Bankrupt Entities' bankruptcy estates, and only the Bankruptcy Trustee has standing to bring or settle these claims.

122. Plaintiffs therefore lack standing to bring their claims for fraud, constructive fraud, and negligent misrepresentation directly against the MetLife Defendants. Accordingly, the MetLife Motions should be, and are, GRANTED to the extent they seek dismissal of the claims against them for fraud, constructive fraud, and negligent misrepresentation arising from Plaintiffs' investments in the Bankrupt Entities. Notwithstanding this conclusion, Plaintiffs have standing to proceed with their fraud, constructive fraud, and negligent misrepresentation claims to the extent such claims seek to hold the MetLife Defendants vicariously liable for the actions of Siskey and the Individual Defendants.

### 4. Negligence (Negligent Supervision)

123. Although Plaintiffs each assert a general negligence claim against the MetLife Defendants, (*see, e.g.*, J. Aldridge Compl. ¶¶ 231–38), Plaintiffs' counsel conceded at the hearing on the Motions that these claims are negligent supervision claims. Accordingly, the Court analyzes them as such.

124. "North Carolina recognizes a cause of action for negligent supervision and retention as an independent tort based on the employer's liability to third parties." *Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 398 (1998). Plaintiffs' negligent supervision claims are based on many of the same allegations underlying their claims for fraud, constructive fraud, and negligent misrepresentation. (*See, e.g.*,

232–36.) Because the Court determines that these allegations do not support a conclusion that Plaintiffs suffered a direct, personalized injury due to the MetLife Defendants' alleged conduct and that the MetLife Defendants did not owe Plaintiffs a special duty, Plaintiffs' claims for negligent supervision also fail for lack of standing. *Cf. Newton*, 248 N.C. App. at 339–40, 788 S.E.2d at 661.

125. The other allegations underlying Plaintiffs' negligent supervision claim all pertain to the MetLife Defendants' conduct in supervising and failing to train Siskey in such a way as to allow him to perpetrate the Ponzi Scheme with the aid of the Individual Defendants. (*See, e.g.*, J. Aldridge Compl. ¶¶ 236–37.) These allegations do not provide Plaintiffs with standing under either of the *Barger*/*Newton* exceptions.

126. The Court therefore concludes that these claims are the property of the Bankrupt Entities' bankruptcy estates, and only the Bankruptcy Trustee has standing to bring or settle these claims. Accordingly, the Court concludes that Plaintiffs lack standing to assert their negligent supervision claims against the MetLife Defendants to the extent such claims are premised on Plaintiffs' investments in the Bankrupt Entities.

127. The Court therefore determines that MetLife Motions should be, and are, GRANTED to the extent they seek dismissal of Plaintiffs' claims for negligent supervision premised on Plaintiffs' investments in the Bankrupt Entities.

### 5. *In pari delicto*

128. Plaintiffs contend that they may nevertheless proceed with their claims, to the extent the Court determines the claims are property of the Bankrupt Entities'

bankruptcy estates, because the Bankruptcy Trustee is barred from asserting such claims under the equitable doctrine of *in pari delicto*. (*See, e.g.*, Pl.'s Mem. Opp'n to Mots. to Dismiss by Defs. Metro. Life Ins. Co. & MSI Fin. Servs., Inc. 5–10, ECF No. 64 ["Pl.'s Mem. Opp'n"] (18 CVS 1050).)

129. "The common-law doctrine of *in pari delicto* (meaning 'of equal fault') is often described as an affirmative defense that bars a wrongdoer from recovering against his alleged co-conspirators." *In re Bogdan*, 414 F.3d 507, 511 (4th Cir. 2005) (citing *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 135 (1968), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)). Plaintiffs' position is that their allegations show that the MetLife Defendants were co-conspirators with the Bankrupt Entities used by Siskey to defraud the Plaintiffs. (*See, e.g.*, Pl.'s Mem. Opp'n 7–10.) Because the Bankruptcy Trustee "stands in the shoes of the [Bankrupt Entities] and can only assert those causes of action possessed by the [Bankrupt Entities,]" Plaintiffs argue that the Bankruptcy Trustee is subject "to the same defenses as could have been asserted" by any parties against whom he may bring claims. (Pl.'s Mem. Opp'n 5 (citing *In re Derivium Capital* LLC, 716 F.3d 355, 367 (4th Cir. 2013)).) Plaintiffs therefore contend that "because MetLife participated in and profited from the Ponzi scheme and conspired with the [Bankrupt Entities], the [Bankruptcy] Trustee . . . has no standing to assert or settle [Plaintiffs'] claims for damages against MetLife[.]" (Pl.'s Mem. Opp'n 9.)

130. The MetLife Defendants respond that Plaintiffs' reliance on the *in pari delicto* affirmative defense is "misplaced." (MetLife's Reply 6.) The Court agrees. Although this State's reported decisions addressing the issue implicated by the Motions do not discuss the doctrine of *in pari delicto* in the standing context, the Court finds related federal authority instructive on this issue.

131. First, generally, an "analysis of standing does not include an analysis of equitable defenses, such as in pari delicto." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 346–47 (3d Cir. 2001) ("Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate questions, to be addressed on their own terms."); *see In re Fair Fin. Co.*, 834 F.3d at 675–76 (collecting cases distinguishing between standing and the affirmative defense of *in pari delicto*).

132. Second, because *in pari delicto* is an affirmative defense, some federal courts have declined to engage in "hypothetical analysis" where, as here, the Bankruptcy Trustee did not bring any claims against third parties but settled with third parties instead. *See Capital Growth*, 565 B.R. at 526 ("To apply the *in pari delicto* doctrine here, where the Trustee did not bring the claim asserted in the [ ] complaint would perversely require ruling on a hypothetical controversy over the Trustee's standing to bring an action that the Trustee never brought when the Trustee had the right and the standing to bring the claims he has already settled with the [third parties]." (citation and internal quotation marks omitted)).

133. The Court is therefore not persuaded by Plaintiffs' argument and concludes that the *in pari delicto* doctrine is inapplicable to, and thus does not alter, the standing analysis conducted by the Court here.

## V. CONCLUSION

134. **THEREFORE**, based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** the Motions and **ORDERS** as follows:

A. The Individual Defendants' Motions are **DENIED** to the extent they seek dismissal under Rule 12(b)(1) and the "first crack" doctrine of Plaintiffs' claims against the Individual Defendants based on Plaintiffs' investments in the Bankrupt Entities.

B. The MetLife Motions are **DENIED** to the extent they seek dismissal under Rule 12(b)(1) and the "first crack" doctrine of Plaintiffs' claims against the MetLife Defendants' for vicarious liability, and thus Plaintiffs' claims for fraud, constructive fraud, negligent misrepresentation, primary violations of the NCSA, professional negligence, and Olin's claim for primary violations of the NCIAA, premised on a *respondeat superior* theory of liability for the MetLife Defendants, based on Plaintiffs' investments in the Bankrupt Entities.

C. The MetLife Motions are **DENIED** to the extent they seek dismissal under Rule 12(b)(1) and the "first crack" doctrine of Plaintiffs' claims against the MetLife Defendants for secondary violations of the NCSA and Olin's claim

against the MetLife Defendants for secondary violations of the NCIAA based on Plaintiffs' investments in the Bankrupt Entities.

D. The MetLife Motions are **GRANTED** to the extent they seek dismissal under Rule 12(b)(1) and the "first crack" doctrine of Plaintiffs' claims against the MetLife Defendants for fraud, constructive fraud, and negligent misrepresentation based on Plaintiffs' investments in the Bankrupt Entities on a direct theory of liability, and these claims are **DISMISSED without prejudice**.

E. The MetLife Motions are **GRANTED** to the extent they seek dismissal under Rule 12(b)(1) and the "first crack" doctrine of Plaintiffs' claims for negligent supervision based on Plaintiffs' investments in the Bankrupt Entities, and these claims are **DISMISSED without prejudice**.

135. The Court **RESERVES RULING** on the Motions to the extent they seek dismissal of Plaintiffs' UDTP and punitive damages claims on grounds distinct from Plaintiffs' investments in the Bankrupt Entities. The Court will address the Motions on these grounds in its forthcoming order and opinion on Defendants' motions pursuant to Rule 12(b)(6). Except as expressly stated in this paragraph, the Motions are **DENIED** to the extent, if any, they seek dismissal of Plaintiffs' UDTP and punitive damages claims based on Rule 12(b)(1) and the "first crack" doctrine.

**SO ORDERED**, this the 15th day of August, 2019.

/s/ Michael L. Robinson

Michael L. Robinson
Special Superior Court Judge
   for Complex Business Cases